## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **DSMC, Inc.** | ) | |
| | ) | |
| | ) | |
| versus | ) | Case #: 1:01CV02284 (EGS) |
| | ) | |
| **CONVERA CORPORATION** | ) | Judge Emmet G. Sullivan |
| | ) | |

## MOTION FOR SUMMARY JUDGMENT
## BY DEFENDANT CONVERA CORPORATION

Defendant Convera Corporation (Convera), by the undersigned counsel, respectfully requests that this Court enter summary judgment in its favor on all claims brought against it in Plaintiff's Third Amended Complaint.  In the alternative, if any claims survive summary judgment, Convera moves for summary judgment on its affirmative defense of setoff.   In support of this Motion, Convera respectfully submits the accompanying Memorandum of Points and Authorities, Statement of Material Facts Not Genuinely Disputed, and Exhibits.  Convera directs the Court's attention to the Notice Regarding Sealed Documents, pursuant to which Convera submits Exhibits 5 through 61 under seal, pursuant to the Protective Order entered in this case.

Respectfully,

**CONVERA CORPORATION**
By Counsel

_____/s/_____
James S. Kurz (D.C. Bar No. 349100)
Virginia W. Hoptman (D.C. Bar No. 367999)
Erin L. Roberts
Audra Hale-Maddox

WOMBLE, CARLYLE, SANDRIDGE & RICE
8065 Leesburg Pike, Fourth Floor
Tysons Corner, VA 22182-2738
Ph. 703 394-2236
*Counsel for Convera Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Defendant Convera Corporation's Motion for

Summary Judgment, together with the Exhibits and Memorandum of Point and Authorities, was

served upon Counsel for Plaintiff,

> Peter H. Gunst
> James B. Astrachan
> Julie R. Rubin
> Astrachan, Gunst & Thomas P.C.
> 217 East Redwood St.
> 21st Floor, Suite 2100
> Baltimore, MD  21202
>
> Bart T. Valad
> The Law Firm of Bart T. Valad PLLC
> 10640 Main St., Suite 200
> Fairfax, VA 22030

by electronic filing under the Rules of this Court on this the 26th day of April, 2006.

/s/
_____
James S. Kurz

WCSR 2337140v1

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DSMC, Inc.** ) | |
| ) | |
| versus ) | Case #: 1:01CV02284 (EGS) |
| ) | |
| **CONVERA CORPORATION** ) | Judge Emmet G. Sullivan |
| ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CONVERA'S MOTION FOR SUMMARY JUDGMENT

Virginia W. Hoptman
James S. Kurz
Erin L. Roberts
Audra Hale-Maddox
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
8065 Leesburg Pike, 4th Floor
Tysons Corner, Virginia 22182
(703) 394-2230
(703) 918-2244 Fax

*Attorneys for Convera Corporation*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ........................................................................... 1

SUMMARY OF FACTS ...................................................................................... 3

    **A.**   PARTIES AND THEIR RELATIONSHIPS ..................................... 3

    **B.**   CONVERA'S PRE-EXISTING *SCREENING ROOM* AND *RETRIEVALWARE* PRODUCTS ........................................................................ 5

    **C.**   NGTL CONTRACT TO MIGRATE AND INTEGRATE THE NGTL DATABASE INTO *SCREENING ROOM* AND TEMPORARILY HOST THE NGTL WEBSITE ......................................................... 5

        **1.**   MIGRATION AND INTEGRATION OF NGTL DATABASE ......................... 6

        **2.**   CONVERA DEVELOPMENT OF NGTL USER INTERFACE FOR TEMPORARY HOSTING ................................................................ 10

    **D.**   NGTL DATABASE AND WEBSITE HOSTED BY DSMCI .............................. 11

    **E.**   EVENTS THAT OCCURRED AFTER THIS LITIGATION WAS FILED ...... 13

ARGUMENT ...................................................................................................... 13

    **I.**   SUMMARY JUDGMENT SHOULD BE GRANTED, DISMISSING DSMCI'S TRADE SECRET CLAIMS ................................................... 14

    **A.**   DSMCI HAS NOT PRESENTED A GENUINE ISSUE OF MATERIAL FACT THAT ITS INFORMATION WAS SECRET .................................................. 14

        **1.**   INFORMATION ASCERTAINED THROUGH ACCESS TO NGTL WEBSITE AND NGTL DATABASE IS NOT DSMCI TRADE SECRET. 15

        **2.**   UNDISPUTED EVIDENCE SHOWS THAT MAS INTEGRATION SOFTWARE WAS GENERALLY KNOWN IN THE INDUSTRY............ 19

    **B.**   DSMCI HAS NOT PRESENTED A GENUINE ISSUE OF MATERIAL FACT TO SHOW IMPROPER MEANS, USE OR DISCLOSURE........................... 22

        **1.**   CONVERA'S ACCESS TO NGTL'S WEBSITE AND DATABASE, USING PASSWORDS PROVIDED BY NGTL, IS NOT "IMPROPER MEANS." 22

        **2.**   NO EVIDENCE THAT CONVERA HAS IMPROPERLY USED OR DISCLOSED ANY DSMCI INFORMATION ............................................... 24

    **II.**   CONVERA SHOULD BE GRANTED SUMMARY JUDGMENT ON DSMCI'S CLAIM OF COPYRIGHT INFRINGEMENT .................................... 25

    **A.**   NO COPYRIGHT INFRINGEMENT OF NGTL DATABASE SCHEMA ........ 25

    **B.**   DSMCI HAS NOT PRESENTED A GENUINE ISSUE OF MATERIAL FACT OF COPYING OF PROTECTABLE ELEMENTS.......................................... 26

    **III.**   SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING

DMCA CLAIMS RAISED IN COUNT III OF THE COMPLAINT ................... 29

A.    USING USERNAME/PASSWORD COMBINATIONS IS NOT
      "CIRCUMVENTION" WITHIN MEANING OF § 1201(A) ........................... 29

B.    NO EVIDENCE OF INTENTIONAL REMOVAL IN VIOLATION OF § 120231

IV.   CONVERA SHOULD BE GRANTED SUMMARY JUDGMENT
      DISMISSING CONSPIRACY CLAIMS ................................................. 33

A.    THIS COURT SHOULD DISMISS THE VBCA CLAIMS................................ 33

1.    THE UTSA PREMPTS VBCA CLAIMS PREDICATED ON TRADE SECRET
      MISAPPROPRIATION................................................................ 33

2.    VBCA DOES NOT APPLY TO CLAIMS BROUGHT UNDER D.C. LAW .. 34

B.    D.C. COMMON-LAW CONSPIRACY CLAIMS SHOULD BE DISMISSED.. 35

V.    SUMMARY JUDGMENT SHOULD BE GRANTED ON SETOFF ................... 35

CONCLUSION.................................................................................... 36

## **TABLE OF AUTHORITIES**

### **Federal Cases**

*Apple Comp., Inc. v. Microsoft Corp.*, 35 F.3d 1435 (9th Cir. 1994), *cert. denied* 513 U.S. 1884...................................................................................................................... 27

*Assess. Tech. of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640 (7th Cir. 2003) ........................... 18, 26

*Batemen v. Mnemonics, Inc.*, 79 F.3d 1532 (11th Cir. 1996)................................................... 26

*Beydoun v. Clark Construction Int'l., LLC*, 72 Fed. Appx. 907 (4th Cir. 2003)........................... 34

*Bonito Boats, Inc. v. Thunder Craft Boat, Inc.*, 489 U.S. 141 (1989)......................................... 16

*Bowers v. Baystate Tech., Inc.*, 320 F.3d 1317 (Fed Cir. 2003)................................................... 26

*Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465 (9th Cir. 1992), *cert. denied* 506 U.S. 869......................................................................................................................... 27

*Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.*, 318 F.Supp. 2d 205 (D. Del. 2004)....................................................................................................................... 20

*Catalyst & Chem. Serv., Inc.*, 350 F.Supp. 2d 1 (D.D.C. 2004), *app. dis'd* 132 Fed. Appx. 837 ........................................................................................................................ 14, 34

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)........................................................................... 13

*Comp. Care Serv., Inc. v. Serv. Sys., Inc.*, 982 F.2d 1063 (7th Cir. 1992)................................... 19

*Computer Associates Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693 (2nd Cir. 1992)......................... 26, 29

*Earthweb, Inc. v. Schlak*, 71 F.Supp. 2d 299 (S.D.N.Y. 1999)................................................... 16

*Egilman v. Keller & Heckman, LLP*, 401 F.Supp. 2d 105 (D.D.C. 2005)................................... 30

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991)......................................... 26

*Frink America, Inc. v. Champion Road Machinery, Ltd*, 48 F.Supp. 2d 198 (N.D.N.Y. 1999) ............................................................................................................................. 15

*Gemisys Corp. v. Phoenix American, Inc.*, 186 F.R.D. 551 (N.D. Cal 1999)............................... 16

*Gilson v. Republic of Ireland*, 606 F.Supp. 38 (D.D.C. 1984), *aff'd*, 787 F.2d 655 (D.C. Cir. 1986)................................................................................................................... 19

*Gordon v. Nextel Comm.*, 345 F.3d 922 (6th Cir. 2003) ........................................................... 32

*Hall v. General Motors Corp.*, 647 F.2d 175 (D.C. Cir. 1980)................................................... 36

*Hudson Hotels Corp., v. Choice Hotels Corp.*, 995 F.2d 1173 (2nd Cir. 1993), *abrogated on other grounds by Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368 (2nd Cir. 2000) ............................................................................................................. 15

*IDX Systems Corp. v. Epic Systems*, 165 F.Supp. 2d 812 (W.D. Wis 2001), *aff'd in rel. part, rev'd in part*, 285 F.3d 581 (7th Cir. 2002) ................................................... 19, 20

*IDX Systems Corp. v. Epic Systems*, 285 F.3d 581 (7th Cir. 2002)................................... 16, 19, 20

*I.M.S. Inq. Mngmt. Sys. v. Berk. Inf. Sys., Inc.*, 307 F.Supp. 2d 521 (S.D.N.Y. 2004)..................................................................................................................... 25, 30

*ILOG, Inc. v. Bell Logic, LLC*, 181 F.Supp. 2d 3 (D. Mass. 2002)........................................ 27, 29

*IMAX Corp. v. Cinema Tech., Inc.*, 152 F.3d 1161 (9th Cir. 1998)........................................... 20

*Kassman v. American Univ.*, 546 F.2d 1029 (D.C. Cir. 1976)................................................... 36

*Kelly v. Arriba Soft Corp.*, 77 F.Supp. 2d 1116 (C.D. Cal. 1999), *aff'd in part, rev'd in part* 336 F.3d 811 (9th Cir. 2003)........................................................................................ 31, 32

*Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974)............................................................. 16

*Linkco, Inc. v. Fujitsu, Ltd.*, 230 F.Supp. 2d 492 (S.D.N.Y. 2002) ..................................... 14, 16

*Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807 (1st Cir. 1995), *aff'd* 516 U.S. 233 (1996) ........................................................................................................................... 27

*Maddog Software, Inc. v. Sklader*, 382 F.Supp. 2d 268 (D.N.H. 2005), ....................................... 29

*MiTek Holdings, Inc. v. Arce Eng. Co.*, 89 F.3d 1548 (11th Cir. 1996) ......................................... 27

*Microstrategy, Inc. v. Business Objects, S.A.*, 429 F.3d 1344 (Fed. Cir. 2005) ...................... 33, 34

*Monotype Imaging, Inc. v. Int'l Typeface Corp.*, 376 F.Supp. 2d 877 (N.D. Ill. 2005) ............... 31

*On-Line Technologies, Inc. v. Bodenseewerk Perken-Elmer Corp.*, 386 F.3d 1133 (Fed. Cir. 2004) ............................................................................................................... 20, 24

*Paper Sales Corp. v. James River Corp. of Va.*, 1990 WL 96097 (S.D.N.Y. July 9, 1990), *aff'd* 930 F.2d 909 (2nd Cir. 1991) .......................................................................................... 34

*Princess Cruises, Inc. v. Amrigon Ent., Inc.*, 51 Fed. Appx. 626, 2002 WL 31190182 (9th Cir. 2002) .......................................................................................................................... 26

*Religious Technology Center v. Lerma*, 908 F.Supp. 1362 (E.D. Va. 1995) ................................. 16

*Religious Technology Center v. Netcom On-Line Commun. Serv., Inc.*, 923 F.Supp. 1231 (N.D. Cal. 1995) ............................................................................................................... 16

*Roboserve, Ltd. v. Tom's Foods, Inc.*, 940 F.2d 1441 (11th Cir. 1991) ......................................... 15

*Saliba v. Exxon Corp.*, 865 F.Supp. 306 (W.D. Va. 1994), *aff'd* 52 F.3d 322 (1995) ................. 35

*Skoog v. McCray Refr. Co.*, 211 F.2d 254 (7th Cir. 1954) .............................................................. 15

*Snowden v. D.C. Transit Sys., Inc.* 454 F.2d 1047 (D.C. Cir. 1971) ............................................. 36

*Universal Analytics v. MacNeal-Schwendler Corp.*, 707 F.Supp. 1170 (C.D. Cal 1989), *aff'd* 914 F.2d 1256 (9th Cir. 1990) ........................................................................................... 20

*Vital State Canada, Ltd. v. Dreampak, LLC*, 303 F.Supp. 2d 516 (D.N.J. 2003) ......................... 16

*Ward v. Nat. Geo. Soc.*, 208 F.Supp. 2d 429 (S.D.N.Y. 2002) ..................................................... 32

*Whelan Assoc., Inc. v. Jaslow Dental Labs, Inc.*, 494 F.2d 1222 (3rd Cir. 1986), *cert. denied* 479 U.S. 1034 (1987) ....................................................................................................... 29

*Whitehead v. CBS/Viacom, Inc.*, 315 F.Supp .2d 1 (D.D.C. 2004) ........................................ 26, 27

## State Cases

*Berg v. Footer*, 673 A.2d 1244 (D.C. 1996) ................................................................................. 36

*Exec. Sand. Shoppe, Inc. v. Carr Rlty Corp.*, 749 A.2d 724 (D.C. 2000) ..................................... 35

*Paramanandam v. Herrmann*, 827 N.E.2d 1173 (Ind. Ct. App. 2005) ......................................... 16

*Plasmanet, Inc., v. APAX Partners, Inc.*, 6 Misc. 3d 1011(A), 800 N.Y.S.2d 354, 2004 WL 3115160 at *3-4 .......................................................................................................... 17

*Weishapl v. Sowers*, 771 A.2d 1014 (D.C. 2001) .......................................................................... 35

*Williams v. Dominion Tech. Partners, LLC*, 265 Va. 280, 576 S.E.2d 752 (2003) ...................... 35

## Federal Statutes

17 U.S.C. § 101 ................................................................................................................................. 1

17 U.S.C. § 1201 ............................................................................................................................... 1

17 U.S.C. § 1201(a) ......................................................................................................................... 30

17 U.S.C. § 1202(b) ................................................................................................................... 32, 33

17 U.S.C. § 1202(b)(1) .................................................................................................................... 31

17 U.S.C. § 1202(b)(3) ............................................................................................................... 31, 32

17 U.S.C. § 411(a) ........................................................................................................................... 25

**State Statutes**

D.C. Code § 36-401...........................................................................................................1
D.C. Code § 36-401(1)...........................................................................................22, 23
D.C. Code § 36-401(2)................................................................................................22
D.C. Code § 36-401(4)................................................................................................19
D.C. Code § 36-408....................................................................................................34
D.C. Stat. § 36-407.....................................................................................................33
Va. Code § 8.01-38.1 .................................................................................................34
Va. Code § 59.1-341 ..................................................................................................33
Va. Code §§ 18.2-499 ..................................................................................................1

## PRELIMINARY STATEMENT

In 2001 Defendant Convera Corporation (Convera) was hired by NGT Library, Inc. (NGTL) to migrate NGTL's searchable video database and temporarily host it on the Internet. At the time, the NGTL Database had been assembled, and was being temporarily hosted, by Plaintiff DSMC, Inc. (DSMCi). To effectuate the migration, NGTL provided Convera with a copy of the NGTL Database and registered Convera as a basic user of the NGTL Website. DSMCi and Convera executed a nondisclosure agreement covering confidential information that might be exchanged during the transition.

Arising out of this migration, DSMCi seeks damages from Convera for alleged trade secret misappropriation under the D.C. Uniform Trade Secrets Act (UTSA),[1] copyright infringement,[2] violation of the Digital Millennium Copyright Act (DMCA),[3] and conspiracy in violation of D.C. common law[4] and the Virginia Business Conspiracy Act (VBCA).[5] NGTL was named as a defendant in this action, but settled with DSMCi for a sum certain without admitting liability. Convera has filed this motion for summary judgment because DSMCi has failed to establish a genuine issue of material fact for at least one element required for recovery under each of its claims. Should any issues remain for trial, Convera seeks summary judgment for a *pro-tanto* credit of the amount of the NGTL settlement against any future jury verdict.

DSMCi claims that Convera misappropriated its trade secrets during the migration of the NGTL Database. Yet Convera had only the same access to DSMCi's work as that enjoyed by every public user registered to use the NGTL Website. Moreover, DSMCi's work combines

---

[1] Compl. ¶¶ 26-28; D.C. Code § 36-401 *et seq.*
[2] Compl. ¶¶ 29-30; 17 U.S.C. § 101 *et seq.*
[3] Compl. ¶¶ 31-35; 17 U.S.C. § 1201 *et seq.*
[4] Compl. ¶¶ 49-51.
[5] Compl. ¶¶ 52-55; Va. Code §§ 18.2-499 *et seq.*

third-party software in ways that were generally known in the industry (and included in Convera's *Screening Room* products) well before Spring 2001.  Finally, with DSMCi's knowledge, Convera received website access and the NGTL Database from NGTL, which represented in writing that Convera could reproduce or use the materials provided by NGTL. Convera used its access and the database schema to locate and extract about 30 million elements of NGTL data from the NGTL Database for migration into *Screening Room*.  Thus DSMCi cannot establish the required elements of secrecy or misappropriation necessary to its trade secret claims.

Next, DSMCi claims that the same conduct also infringed its copyrighted software, which DSMCi did not register until several months after this litigation was filed.  Yet the schema for the NGTL Database was not included in the registration, and even if it had been, copying a database schema for purposes of extracting noncopyrighted data is fair use.  Also, despite extensive discovery, DSMCi has identified neither (1) any protectable elements in its registered software nor (2) any colorable evidence of copying.  Moreover, the DMCA copyright claims are directly contrary to controlling authority: (1) this Court has held that using a valid password, even if unauthorized, does not violate the DMCA; and (2) DSMCi's claims do not constitute the intentional removal of copyright management information as a matter of law.

Finally, DSMCi's conspiracy claims are equally invalid.  The UTSA preempts claims brought under the VBCA where, as here, violations of the VBCA are based on the misappropriation of trade secrets.  Moreover, the VBCA does not apply where, as here, plaintiff's claims are brought under the substantive law of another state.  And DSMCi has presented only its speculation imposed on a normal business relationship, together with disappointment at NGTL's decision not to extent its temporary hosting contract, to support its

conspiracy claims under both the VBCA and D.C. common law. This is insufficient as a matter of law.

## SUMMARY OF FACTS

This factual summary is derived from the separate Statement of Material Facts Not Generally Disputed ("SMF") that Convera has attached in compliance with Local Rule 56.1.

### A.    PARTIES AND THEIR RELATIONSHIPS

**NGTL**, a Delaware corporation with its offices in Washington, D.C., is responsible for managing, preserving, and distributing film footage produced by National Geographic Television. (SMF ¶ 5.) In 2000, NGTL implemented its strategy to manage and commercially offer its video assets through a web-based, searchable video database. (*Id.* ¶¶ 7-8.) NGTL hired DSMCi and another company, Archive Impact, to implement the first phase of this plan. DSMCi was hired to (1) digitize approximately 2000 hours of NGTL video footage, (2) create a searchable database of the standard metadata associated with the digitized footage, together with additional metadata containing Archive Impact's detailed descriptions of the tens of thousands of NGTL video clips, and (3) temporarily host the searchable database on the Internet. (*Id.* ¶¶ 7, 10.)

**DSMCi**, a Maryland company that currently conducts no business,[6] executed an Integrated Services Agreement with NGTL in September 2000 ("DSMCi/NGTL ISA"). (*Id.* ¶¶ 3-4, 9.) The DSMCi/NGTL ISA requires that DSMCi deliver to NGTL the "final NGTL Database backup on DLT," as well as periodic backups of the NGTL Database. (*Id.* ¶ 12.) The NGTL Database consists of the NGTL video files, keyframe files (i.e., still shots taken from the videos) and metadata database. The DSMCi/NGTL ISA also called for DSMCi to temporarily

---

[6] Convera is currently taking discovery concerning whether DSMCi remains the real party in interest with standing to pursue this litigation. Depending on the outcome of this discovery, Convera may move to substitute either or both of Concentia Digital, Inc., or Strata Group, Inc., as the real party in interest.

host the NGTL Website from December 2000 through early July 2001. (*Id.* ¶ 14.)   From the outset, DSMCi understood that NGTL intended to use the website to commercially offer its video clips to film producers, distributors, and other customers.  (*Id.* ¶ 8.)   During the time DSMCi hosted the website, NGTL registered several hundred users from around the world.  (*Id.* ¶¶ 102,109.)  Any Internet user could visit the NGTL LOGIN page at *www.ngtlibrary.com*, register, and request a username and password from NGTL.  (*Id.* ¶ 45.)  NGTL, not DSMCi, had control over registration of its website users.  (*Id.* ¶ 106.)  Also from the outset, DSMCi understood that NGTL intended to transition its database either in-house or to NGTL's designee.  (*Id.* ¶¶ 13-14.)

**Convera**, a Delaware corporation with its corporate offices in Virginia, is primarily a software developer and vendor.  (*Id.* ¶¶ 1-2.)  Leading up to Spring 2001, NGTL and Convera had ongoing business development contacts.  (*Id.* ¶¶ 62-64.)  In May 2001 NGTL invited Convera to submit a proposal to (1) migrate and integrate the NGTL Database into Convera's video management product, *Screening Room*; (2) add NGTL-requested functionality to operate with *Screening Room*; and (3) temporarily host the NGTL Website. (*Id.* ¶ 17.)  On July 20, 2001, NGTL and Convera executed a Master Services Agreement ("Convera/NGTL MSA") and NGTL procured a *Screening Room* license. (*Id.* ¶ 16.)   NGTL represented and warranted to Convera that all "material provided to Convera by NGTL or on its behalf may be reproduced and otherwise utilized as necessary by Convera" in its work with NGTL.  (*Id.* ¶ 18.)

Convera was not a party to, and never received a copy of, the DSMCi/NGTL ISA. (*Id.* ¶ 15.)  DSMCi and Convera were simply sequential vendors to NGTL who executed a nondisclosure agreement to cover confidential information that might be shared in the transition.

### B.    CONVERA'S PRE-EXISTING *SCREENING ROOM* AND *RETRIEVALWARE* PRODUCTS

Convera's flagship product, *RetrievalWare*, is an enterprise search, retrieval, and categorization product used by major corporations and government agencies. (*Id.* ¶ 2.)  In 1997-1998, Convera developed a second software product, *Screening Room*, which manages significant video libraries and uses *RetrievalWare* as its search software.  Convera invested about $30 million in *RetrievalWare* and an additional $30 million in *Screening Room*. (*Id.* ¶¶ 21-25.) Before May 2000, Convera had released *Screening Room Version 2.2* as a customizable out-of-the-box digital video management software product with desk-top and web-based features, and had implemented a development spur to *Screening Room* for NASA's the International Space Station ("*Screening Room/NASA*").  *Screening Room/NASA* allowed the user to search the digitized video database at the clip level and incorporated an extendable database schema suitable for use by other clients.  The schema and functionality of *Screening Room/NASA* was scheduled to be, and was, included in the next release of *Screening Room* – Version 2.3, which was released in Spring 2002.  (*Id.* ¶¶ 26-27.)

### C.    NGTL CONTRACT TO MIGRATE AND INTEGRATE THE NGTL DATABASE INTO *SCREENING ROOM* AND TEMPORARILY HOST THE NGTL WEBSITE

NGTL invited Convera to bid on the migration of the NGTL Database into *Screening Room*.  On May 10, 2001, two Convera engineers, Jim Rose and Brian Archibald, met with NGTL to determine the feasibility and costs.  NGTL asked DSMCi's CEO, Duane Shugars, and its Vice-President Gary Clarke to attend this meeting.  (*Id.* ¶¶ 65-66.)  To assess the feasibility and cost of a *Screening Room* solution, Rose requested the schema for the NGTL Database and access to the NGTL Website. (*Id.* ¶¶ 68-71.)  The schema shows the organization of data within a database and may be presented as a diagram. (*Id.* ¶¶ 52, 54.)  Within one week of this meeting,

(1) NGTL had registered Convera as a basic user on its website, assigning it the username "Wart" and a password; (2) NGTL had shipped to Convera a backup copy of the NGTL Database on DLT tapes so Convera could restore the NGTL Database and identify the database schema; and (3) DSMCi and Convera had executed a nondisclosure agreement. (*Id.* ¶¶ 71-75, 79, & 108.) Due to technical problems accessing the DLT tapes sent by NGTL, Convera could not restore the NGTL Database and identify its schema until mid-July. (*Id.* ¶¶ 79-83.)

## 1. Migration and Integration of NGTL Database

Convera used the *Screening Room/NASA* release as the base for the *Screening Room/NGTL* database because NGTL's technical requirements for video archiving, clip-level search, and retrieval were very similar to those Convera had developed for NASA. Convera reconfigured the *Screening Room/NASA* extendable database schema to accommodate NGTL's data when it created the *Screening Room/NGTL* database. (*Id.* ¶¶ 28-29.) During discovery, Convera produced to DSMCi sixteen iterations of the *Screening Room/NGTL* database schema, covering all steps in the development of the schema from its starting point until well after Convera accepted hosting of the NGTL Website. (*Id.* ¶ 77.)

The NGTL Database contained about 30 million data elements, consisting of approximately 2000 hours of digitized film footage, keyframes (i.e., still shots taken from the digitized video), and associated metadata. (*Id.* ¶ 78.) To migrate the database, Convera wrote SQL scripts ("DataMover scripts") that picked these individual data elements out of the NGTL Database and inserted them into the *Screening Room/NGTL* database. (*Id.* ¶ 85.) The DataMover scripts were developed through multiple steps and were produced to DSMCi in discovery. (*Id.* ¶ 86.) Writing the DataMover scripts required detailed knowledge of the schema of both the existing NGTL Database and the target *Screening Room/NGTL* database. (*Id.* ¶ 78.)

Accordingly, the Convera/NGTL MSA specified that Convera would:

- "Acquire the NGTL data schema ...
- Acquire the NGTL Oracle DB backup data
- Extract the data from the Oracle backup and integrate into [Screening Room's] relational database
- Associate the backup Metadata with the Pre-existing Digital Assets
- Transfer Other Metadata to the [Screening Room Relational Database]
- Do quality review and testing with NGTL to insure accurate transfer of Pre-existing Digital Assets, Other Metadata, and other data"

(*Id.* ¶ 19.)  And NGTL represented and warranted to Convera that all "material provided to Convera by NGTL or on its behalf may be reproduced and otherwise utilized as necessary by Convera" in its work with NGTL. (*Id.* ¶ 18.)

### a)    NGTL and DSMCi Deliver NGTL Database to Convera

Convera's database conversion work started in mid-July and lasted approximately nine weeks.  (*Id.* ¶¶ 77-95.)  In July 2001, NGTL gave Convera a copy of the NGTL Database, replacing the DLT tapes sent earlier by NGTL, and the password "icepick" to open the database. (*Id.* ¶ 79-80.)  In addition, at NGTL's instruction, DSMCi copied the full NGTL Database,[7] including all video files and keyfames to a Network Appliance storage device for delivery to Convera.  The Network Appliance storage device was shipped to Oregon where Convera was preparing the hosting site.  (*Id.* ¶ 84.)

Although Convera readily determined the NGTL Database schema from the restored database, the schema did not account for a substantial number of NGTL data and keyframe files. Only about 10-15% of the 2.5 million keyframes in the NGTL Database could be properly associated with the video clips from which they were made.  (*Id.* ¶¶ 87-88, 90.)  DSMCi records

---

[7] In addition to an updated version of the backup metadata database Convera had received from NGTL, this transfer included massive video and keyframe files.

and testimony confirm that DSMCi was working to solve this problem after Convera received the database. (*Id.* ¶¶ 91-92.) There were additional errors and dirty data in the NGTL Database, which interfered with Convera's migration efforts and required that additional rules be written for the DataMover Scripts. (*Id.* ¶ 93.) No DSMCi documentation was available, and Convera had no direct access to DSMCi engineers or programmers. (*Id.* ¶ 88.) So Convera relied on access to the NGTL Website to observe how the database functioned in real time from a website user's perspective in its efforts to locate missing data and clean up errors.

Simple searches on the NGTL Website confirmed that, in real-time, keyframes that could not be located in the restored database appeared in consistent order on the website. Convera attempted to locate the problem keyframes by "reverse engineering" their location from the website searches, but was not successful. In discovery, Convera produced to DSMCi "FrameMover" scripts, which Convera had written and used to migrate approximately 10-15% of the NGTL keyframe files. (*Id.* ¶¶ 88-90.)

### b) Convera's Access to NGTL Website

NGTL required that DSMCi keep logs to record all activity on the NGTL Website. According to DSMCi, its logs accurately recorded all activity on the website, including each Convera access and inquiry. (*Id.* ¶ 105.) Assuming that this is true for purposes of this summary judgment motion, DSMCi claims that its logs show that Convera accessed the NGTL Website with the Wart username/password combination from May 2001 until August 16, 2001. (*Id.* ¶¶ 105-108, 111, 115, 117.) Next, DSMCi claims that between August 16 and August 21 Convera accessed the NGTL Website using the "MRice" username/password combination on several occasions and using the "AIQC" username/password combination on one occasion on August

16.[8]  (*Id.* ¶ 105, 111, 115-17.)  The DSMCi logs show no Convera logins to the NGTL Website

after August 21, 2001.  (*Id.* ¶¶ 105, 123.)

Convera does not dispute that it used the Wart username/password combination until this

combination failed on Thursday, August 16, 2001, when Stephen Chen, a Convera engineer, tried

to access the NGTL Website. (*Id.* ¶ 115.)  Chen then selected "MRice" from the user part of the

NGTL Database to use in the interim until Wart was reinstated by NGTL.  (*Id.* ¶ 115-16.)  Shaun

Henderson, the Convera project manager, followed up with NGTL about the recent failure of the

Wart username/password combination when he returned to work on August 21.   Dean Watts, the

NGTL project manager, told Henderson that NGTL and DSMCi were in a dispute and that

Convera should stop its access to the website at that time.  Convera did not further access the site

after NGTL instructed it not to do so.  (*Id.* ¶¶ 119-23.)

The Wart and MRice username/password combinations were registered as basic users of

the NGTL Website.  (*Id.* ¶¶ 49, 106, 115.)   Basic users have "read-only" privileges to the

website – they can see only what is presented to the public on the browser, i.e. the Internet

webpages and the client-side code that any Internet user can see by right-clicking on the webpage

and selecting "View Source."  And basic users have no access to administrative functions on the

website or to any source code or server-side code.  (*Id.* ¶¶ 46-51.)   AIQC is a registered

administrative user of the NGTL Website.  Like the basic user, an administrative user has no

access to source code or server-side code, but can see only the client-side code viewable by any

Internet user.  (*Id.* ¶ 118.)  The single instance DSMCi contends that Convera used the AIQC

username/password combination did not involve accessing the administrative functions of the

---

[8] Convera disputes that it visited the NGTL Website using the AIQC username/password
combination, but will assume that DSMCi claims are true for purposes of summary judgment
motion.

website.  (*Id.* ¶ 117.)

### 2. Convera Development of NGTL User Interface for Temporary Hosting

The NGTL user interface is the screen display through which the website user experiences the search, retrieve, edit and save functions required by NGTL.  NGTL specified the functionality and look and feel for Convera's temporary hosting of its website.  (*Id.* ¶ 96.) Convera added custom code to existing *Screening Room* user interface code to comply with NGTL requirements.  (*Id.* ¶¶ 97, 104.)  This code is client-side code, and tells the user's browser how to display the graphics and functions on a given webpage.  (*Id.* ¶ 51.)  Starting with screen shots and other information provided by NGTL, the Convera design team, led by Chris Rich, documented the NGTL user interface requirements.  Henderson then prepared Requirement Documents based on Rich's specifications, and Chen's engineering team wrote the custom code consistent with the Requirements Documents.  (*Id.* ¶ 97.)

In contrast to the NGTL webpages created by DSMCi, Convera used Active Server Pages ("ASP") to develop its user interface screens.  (*Id.* ¶ 23.)  Thus, client-side code literally copied from the NGTL Website hosted by DSMCi could not have worked on the website hosted by Convera.  (*Id.* ¶ 44.)  This client-side code included code for the font, colors, general page layout and some JavaScript.  (*Id.* ¶ 100.)

In late August 2001 Chen discovered that one of his engineers had used some client-side code from the NGTL Website LOGIN page to model portions of a few Convera webpages.  (*Id.* ¶ 100.)  Chen personally identified the webpages in development that possibly included code taken from the LOGIN page, destroyed those pages, and assigned a different engineer to develop from scratch the destroyed pages without using any client-side code from the existing NGTL Website.

This work required perhaps one day of additional effort, and was completed well before Convera assumed hosting responsibility for the NGTL Website on September 15, 2001. (*Id.* ¶ 100-101.) When hosted by DSMCi, the NGTL LOGIN page had the NGTL copyright notice "© 2000 National Geographic Television Library, Inc." (*Id.* ¶ 102.)  The client-side code for the NGTL LOGIN page includes no DSMCi copyright information. (*Id.* ¶ 103.)

### D.    NGTL DATABASE AND WEBSITE HOSTED BY DSMCI

In constructing the NGTL Database and Website, DSMCi used and integrated several third-party commercial products: (1) Oracle Systems' relational database management system to build the metadata database; (2) the Virage VideoLogger software, which provided the basic function, architecture, and interfaces for the database; (3) Netscape's Enterprise Webserver, which connected to the database and served webpages to the user; and (4) Verity-brand search and retrieval software to perform the search and retrieval functions. (*Id.* ¶¶ 55-56.)  The combination of these or similar products to create precisely the web-based video-asset-management system that DSMCi provided to NGTL were generally available and used by the industry several years earlier: (1) in 1997, they were spelled out in publications from Virage and Oracle as virtual "cookbooks" for creating this kind of system; (2) in 1999, they could be experienced at *MediaSite.Net*, a publicly accessible, on-line, web-based, digital-video-clip-search, retrieval, keyframe-storyboarding, hosting, and video-streaming Internet service with a rich user interface; and (3) they were published in thirteen patents issued prior to November 15, 2000.  (*Id.* ¶¶ 57-61.)

DSMCi used its "Media Archive System" ("MAS") integration software to host the

NGTL Website.  The MAS integration software consists of a series of HTML and JavaScripts[9] that link the searchable NGTL Database to the Netscape web server, allowing users to access the website from the Internet, search through the database, and view selected video clips. These scripts contain server-side JavaScript, as well as client-side HMTL and JavaScript. (*Id.* ¶ 55.) NGTL dictated the look and feel requirements for its website, and the client-side code instructs the website user's computer how to display these requirements on each webpage. (*Id.* ¶ 11.)  Any worldwide Internet user could view the client-side code for the NGTL LOGIN page simply by visiting *www.ngtlibrary.com*, right-clicking on the LOGIN page, and selecting "View Source." (*Id.* ¶¶ 45, 51.)

The NGTL Website uses the same "web gateway" software DSMCi wrote under an earlier contract with South Carolina Educational Television (SCEdTV) with a link to added search software. (*Id.* ¶¶ 30-34.)  In addition to SCEdTV and NGTL, DSMCi also delivered this software to Computer Science Corporation (CSC) and a Michigan company known as MINDS. (*Id.* ¶¶ 30, 32-34.)  The NGTL Database also used the same schema as these clients, with minor customization for the NGTL data. (*Id.* ¶¶ 33-34, 53.)  This schema shows the organization of the client's data within an Oracle relational database and can be readily ascertained using standard Oracle functions.  All relational database management systems have this function because anyone maintaining a database needs to understand its basic schema.  (*Id.* ¶¶ 52, 54.)  There is no evidence that DSMCi exercised any control over users of the systems delivered to SCEdTV, CSC, or MINDS.  (*Id.* ¶¶ 35-37.)

DSMCi deposition testimony refers to the MAS software used for NGTL, SCEdTV,

---

[9] HTML and JavaScripts are standard computer code used to generate webpages and to enable links that display documents, images, video or other data on the webpage.

CSC, and MINDS as various client releases of MAS Version 1. (*Id.* ¶ 32.) DSMCi marketed MAS Version 1, demonstrating its features at one-week conferences of the National Association of Broadcasters (NAB) held in 1999-2000, which drew tens of thousands of attendees each year. (*Id.* ¶ 39.) DSMCi also demonstrated MAS features by copying the graphic look and feel from a prospective customer's website and delivering a customized website demo. (*Id.* ¶ 33.)

NGTL was one of the last deployments of the MAS Version 1 software. (*Id.* ¶ 38.) MAS Version 2 was in development in 2000-2001 while DSMCi was constructing the NGTL Database. According to DSMCi testimony, MAS Version 2 used a new architecture, a more sophisticated data model, vastly different schema, and a completely different user interface design. (*Id.* ¶ 41.)

### E.     EVENTS THAT OCCURRED AFTER THIS LITIGATION WAS FILED

**On March 1, 2002**, several months after this litigation was filed, DSMCi filed a Certificate of Registration in the Copyright Office for the MAS Version 1 software used to host the NGTL Website. (*Id.* ¶ 42.) The MAS software registered by DSMCi includes about 240 HTML files but does not include the schema for the NGTL Database. (*Id.* ¶ 43.)

**From May 2002 until July 2003**, when NGTL transferred the hosting of the *Screening Room/NGTL* Website from Convera to its in-house facilities, DSMCi was given a username/password combination for accessing the *Screening Room/NGTL* Website. (*Id.* ¶ 99.)

**In December 2005**, NGTL settled with DSMCi, paid DSMCi a specified sum, and admitted no liability. (*Id.* ¶ 6.)

### ARGUMENT

Summary judgment is mandated where the nonmoving party, after adequate discovery, "fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial."[10]  This is just such a

case.  After extensive discovery, DSMCi has failed to establish a genuine issue of material fact

with regard to at least one element required for recovery under each of its claims.  And should

any issues remain for trial, Convera is entitled to summary judgment granting Convera's

affirmative defense of setoff.  These issues will be addressed in turn.

## I.  SUMMARY JUDGMENT SHOULD BE GRANTED, DISMISSING DSMCI'S TRADE SECRET CLAIMS

DSMCi seeks to recover damages under the UTSA, claiming that Convera

misappropriated its trade secrets by accessing the NGTL Database and Website as a user

registered by NGTL.  In interpreting the UTSA, D.C. courts look to decisions in other

jurisdictions for guidance.[11]  These decisions recognize that a plaintiff must establish that its

putative trade secret: (1) is secret, and not generally known or readily ascertainable by those

knowledgeable in the industry; and (2) was acquired by improper means, or was improperly used

or disclosed by one under a duty not to disclose.[12]  DSMCi can establish neither of these

elements.

### A.  DSMCI HAS NOT PRESENTED A GENUINE ISSUE OF MATERIAL FACT THAT ITS INFORMATION WAS SECRET

The hallmark of a trade secret is its secrecy: information "generally known or readily

ascertainable by the public" cannot constitute a trade secret.[13]  Although the question of secrecy is

generally one of fact, courts have denied trade secret protection as a matter of law where the

---

[10] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[11] *See, e.g , Catalyst & Chem. Serv., Inc.*, 350 F.Supp.2d 1, 7 n.3 (D.D.C. 2004), *app. dis'd*, 132 Fed. Appx. 837 (Fed. Cir. 2005).

[12] *See* cases discussed *infra* at pp. 15-19.

[13] *Catalyst*, 350 F.Supp.2d at 8-9 (quotations omitted).

information can be ascertained by users of the product in the market.[14]  This is particularly apt here because Convera's only access to DSMCi's MAS integration software was the same access given to all users of the NGTL Website. In addition, this Court and others have granted summary judgment where plaintiff fails to specify the secret aspects of its information, particularly in cases involving computer programs containing third-party and standard programming features.[15]

### 1. Information Ascertained Through Access to NGTL Website and NGTL Database is Not DSMCi Trade Secret

Trade secret law does not protect information that can be discerned from the use or inspection of a product by the public.  Indeed trade secret law permits – even encourages – the process of reverse engineering by which a skilled person studies a product and figures out how to produce it.  Yet DSMCi relies on this very process to support its claims of trade secret misappropriation, arguing that Convera accessed the NGTL Website, performed the search, clip, edit, and other functions available to all registered users of that website, and thereby reverse engineered the look and feel and functionality of the NGTL Website.  Even assuming that these allegations are true, Convera is entitled to summary judgment on these claims as a matter of law because the experience by these users is not a protectable trade secret.

It is axiomatic that a product, once launched in the market, retains no trade secret protection in regard to the user's experience of that product.  Accordingly, the public display[16] or sale[17] of a product necessarily destroys any reasonable expectation of secrecy because a product

---

[14] *See, e.g., Linkco, Inc. v. Fujitsu, Ltd.*, 230 F.Supp.2d 492 (S.D.N.Y. 2002).
[15] *See* cases discussed *infra* at pp. 19-22.
[16] *E.g., Skoog v. McCray Refr. Co.*, 211 F.2d 254, 257 (7th Cir. 1954); *Frink America, Inc. v. Champion Road Machinery, Ltd*, 48 F.Supp.2d 198, 207-8 (N.D.N.Y. 1999).
[17] *E.g., Roboserve, Ltd. v. Tom's Foods, Inc.*, 940 F.2d 1441, 1454-55 (11th Cir. 1991).

"cannot be used secretly and continuously in its business."[18]  Indeed, the Supreme Court has

relied on this fundamental tenet of trade secret protection to distinguish state trade secret laws

from other laws struck down because they prohibit the copying or reverse engineering of

products available in the market and thus are preempted by federal patent law.[19]

Consistent with this tenet, courts have denied trade secret protection to those aspects of a

computer program that can be experienced or observed by program users. For example, in

*Linkco, Inc. v. Fujitsu, Ltd.*,[20] the Southern District of New York held that software architecture,

once reduced to a product, is revealed, becomes obvious to the user, and "cannot rise to the level

of a trade secret, as a matter of law."  Similarly in *Gemisys Corp. v. Phoenix American, Inc.*,[21] the

Northern District of California granted summary judgment, holding that user screen displays,

functionality, structure, data or other information, which can be observed by users of a software

program, are not protectable trade secrets.  And in *IDX Systems Corp v. Epic Systems*,[22] the

Seventh Circuit held that summary judgment was appropriate where plaintiff's trade secret

description included material that was readily observable by ordinary users of its software.

The same is true in regard to information published on websites, even if the Internet

posting is temporary.[23]  Indeed, no information revealed by a plaintiff's website is a protected

---

[18] *Hudson Hotels Corp., v. Choice Hotels Corp.*, 995 F.2d 1173, 1177 (2nd Cir. 1993), *abrogated on other grounds by Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368 (2nd Cir. 2000).
[19] *Bonito Boats, Inc. v. Thunder Craft Boat, Inc.*, 489 U.S. 141, 150-68 (1989); *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974).
[20] *Linkco, Inc. v. Fujitsu, Ltd.*, 230 F.Supp.2d 492, 499 (S.D.N.Y. 2002).
[21] *Gemisys Corp. v. Phoenix American, Inc.*, 186 F.R.D. 551 (N.D. Cal. 1999),
[22] *IDX Systems Corp. v. Epic Systems*, 285 F.3d 581 (7th Cir. 2002).
[23] *See, e.g., Religious Technology Center v. Netcom On-Line Commun. Serv., Inc.*, 923 F.Supp. 1231, 1246-57 (N.D. Cal. 1995); *Religious Technology Center v. Lerma*, 908 F. Supp. 1362, 1368 (E.D. Va. 1995).  More recently, the New Jersey District Court relied on the publication of plaintiff's putative secrets on an educational website to deny a preliminary injunction.  *See Vital State Canada, Ltd. v. Dreampak, LLC*, 303 F.Supp.2d 516, 526-27 (D.N.J. 2003).

trade secret unless the plaintiff makes reasonable efforts to keep its website information secret.[24] In *Earthweb, Inc. v. Schlack*,[25] the Southern District of New York indicated that trade secret protection does not extend to the strategic thinking behind a company's websites to the extent it is necessarily revealed when the websites are launched.  Similarly, the New York Supreme Court recently held that a complaint alleging misappropriation of the "look and feel" and "functionality" of a website fails to state a claim because the essential element of secrecy is necessarily lacking.[26]

These cases make it clear that any DSMCi information Convera garnered by accessing the NGTL Website is not secret as a matter of law.  The NGTL Website was created for the very purpose of facilitating the commercial sale of NGTL's video footage around the world.  From the outset, DSMCi understood that this was its purpose. While DSMCi hosted the NGTL Website, NGTL registered several hundred users from around the world (including its potential customers, producers, distributors, and vendors).  DSMCi exercised no control over who NGTL registered to use its website.

Any user of the *world-wide web* could access the NGTL LOGIN at *www.ngtlibrary.com*. Any user registered by NGTL could search the digitized video footage at the clip level, and then select, edit, and save video clips just as Convera did.    And Convera used the same basic-user access as these other users.  Like millions of Internet users, Convera could "right click" on the NGTL LOGIN page, select "View Source" and observe the basic HTML and JavaScript coding for that webpage.  Like other registered Internet users, Convera could observe the look and feel

---

[24] *See Paramanandam v. Herrmann*, 827 N.E.2d 1173, 1179-80 (Ind. Ct. App. 2005)
[25] *Earthweb, Inc. v. Schlak*, 71 F.Supp.2d 299, 314-15 (S.D.N.Y. 1999).
[26] *Plasmanet, Inc., v. APAX Partners, Inc.*, 6 Misc. 3d 1011(A), 800 N.Y.S.2d 354, 2004 WL 3115160 at *3-4 (N.Y. Sup. Nov. 22, 2004) (unpublished).

and the basic functionality of the NGTL Website but could not access source or server-side code. In other words, Convera – like all registered users – could observe *what* the NGTL Website allowed them to do with the NGTL Database, but not *how*, through trade secrets or otherwise, DSMCi combined the server-side or source code of its MAS integration software with third-party software to deliver the basic functionality observed by the public. Accordingly, information garnered by accessing the NGTL Website is not "secret" as a matter of law.

The same analysis applies to the schema of the NGTL Database.[27] The NGTL Database was owned by NGTL and was required as a final deliverable under the DSMCi/NGTL ISA without restriction. The schema, describing the location of data, is inseparable from the database itself. DSMCi had assembled the NGTL Database using Oracle commercial software, which, like other relational database management programs, readily displays the database schema. Convera, like NGTL or anyone authorized by NGTL to access its database, could readily observe the schema from the NGTL Database itself.

Moreover, in assembling and hosting the NGTL Database and Website, DSMCi used the same software and database schema previously launched in products sold to SCEdTV, MINDS, and CSC. And DSMCi had marketed this same product package, demonstrating the MAS features to anyone who visited DSMCi's booth at multiple NAB conferences, which each drew tens of thousands of attendees each year, and to potential customers by creating customized website demos. Because DSMCi has launched this same product into the marketplace, allowed Internet use over which DSMCi exercised no control, and engaged in many public

---

[27] *See Assess. Tech. of WI, LLC, v. WIREdata, Inc.*, 350 F.3d 640, 642 (7th Cir. 2003) ("A sample database in the demo version of AT's product--a version freely distributed for promotional purposes--reveals the entire structure of the database, thus making the trade secret claim incomprehensible to us.")

demonstrations, the experience of a basic user of this product cannot be secret as a matter of law.

### 2. Undisputed Evidence Shows that MAS Integration Software Was Generally Known in the Industry

Independent of the above argument, summary judgment should be granted on DSMCi's trade secret claim because DSMCi has failed to identify specific secrets that are not generally known or easily duplicated by those in the industry.[28] This Court has recognized that summary judgment is appropriate where, as here, plaintiff fails to present admissible evidence that the putative trade secrets were his own secrets, as opposed to the general secrets of a small, specialized segment of the industry in which he was engaged.[29]

In regard to computer software, the law is clear – while computer software or program features may qualify for trade secret protection, plaintiff bears the burden of specifying which code, or unique combination of features, are its particular trade secrets.[30] And to survive summary judgment, a trade secret plaintiff must come forward with specific admissible evidence describing the portions of its software program that are not generally known in the industry.

For example, in *IDX Systems Corp v. Epic Systems*, the district court granted summary judgment because plaintiff failed to describe its trade secrets in sufficient detail to allow a reasonable jury to find that its putative trade secrets were not generally known in the industry.[31] On appeal, the Seventh Circuit agreed, holding that plaintiff could not merely point to its

---

[28] *See* D.C.Code § 36-401(4) (trade secret must derive actual or potential economic value from "not being generally known to, and not being readily ascertainable by, proper means").

[29] *Gilson v. Republic Of Ireland*, 606 F.Supp. 38, 43-44 (D.D.C. 1984), *aff'd*, 787 F.2d 655 (D.C. Cir. 1986).

[30] *E.g.*, *Comp. Care Serv., Inc. v. Serv. Sys., Inc.*, 982 F.2d 1063, 1072-76 (7th Cir. 1992) (reversing preliminary injunction as abuse of discretion absent evidence that alleged secrets in computerized program – individually or in combination – were not generally known or readily duplicated).

[31] *IDX Systems Corp. v. Epic Systems*, 165 F.Supp.2d 812, 816-17 (W.D. Wis. 2001), *aff'd in rel. part, rev'd in part*, 285 F.3d 581, 583-84 (7th Cir. 2002).

"software package" or to the "methods and processes underlying and the inter-relationships among various features" because these descriptions include standard features and screen displays, which are generally known or readily observable.[32]  Nor could plaintiff merely describe the kind of technology or functions provided by its software.  To avoid summary judgment, plaintiff should have identified specific algorithms used by its software that were genuine trade secrets.[33]

In *IMAX Corp. v. Cinema Tech., Inc.*, the Ninth Circuit took the same approach, holding that the UTSA plaintiff "'should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons … skilled in the trade.'"[34]  The *IMAX* court held that summary judgment was proper because plaintiff failed to indicate the precise numerical dimensions and tolerances of its projector system; merely identifying all "dimensions and tolerances," was not sufficient to survive summary judgment.[35]  And in *On-Line Technologies, Inc. v. Bodenseewerk Perken-Elmer Corp.*, the Federal Circuit ruled that summary judgment was appropriate where plaintiff had not presented credible evidence that its particular use of patented technology was a protectable trade secret.[36]

---

[32] *IDX Systems Corp. v. Epic Systems*, 285 F.3d at 584.
[33] *Id.*
[34] *IMAX Corp. v. Cinema Tech., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998) (emphasis in original) (*quoting Universal Analytics v. MacNeal-Schwendler Corp.*, 707 F.Supp. 1170, 1177 (C.D. Cal. 1989), *aff'd*, 914 F.2d 1256 (9th cir. 1990)).  Several other courts have done the same. *See, e.g., Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.*, 318 F.Supp.2d 205, 210-212 (D. Del. 2004) (subject matter of trade secret must be described with sufficient particularity to separate it from matters of general knowledge of the trade or special knowledge of those skilled in the trade).
[35] *IMAX Corp.*, 152 F.3d at 1167.
[36] *On-Line Technologies, Inc. v. Bodenseewerk Perken-Elmer Corp.*, 386 F.3d 1133, 1142-43 (Fed. Cir. 2004).

Based on these cases, summary judgment is appropriate because DSMCi has failed to identify anything beyond the basic functions and features of the MAS integration and third-party software it used to assemble and host the NGTL Database. DSMCi has not identified any specific algorithms or source-code combinations. Instead, like the plaintiffs in *IMAX* and *IDX*, DSMCi has identified as its trade secrets basic software features and functions relating to clip-level access and search capabilities and various video-database-management functions performed through a web browser.

These general features and functions were known in May 2001. *Screening Room/NASA* had clip-level access and search capabilities and an extendible database schema that could more than accommodate the digitized video data in the NGTL Database. *SR/Browse,* a core *Screening Room* software component, provided video-database-management functions through a web browser. Moreover, many features of the NGTL Database and Website were provided by third-party commercial software DSMCi admittedly used to construct the NGTL Database.[37] DSMCi can claim no trade secret protection for features or functions it purchased from others.

Nor can DSMCi claim trade secret protection for its combination of these functions because it has not identified that (or how) this combination is unique or distinguished from published and generally known methods of combination.[38] Indeed, the methods for creating precisely the type of web-based video-asset-management system that DSMCi provided to NGTL were generally known and available several years before DSMCi constructed the NGTL Database, having been spelled out in Virage and Oracle publications in 1997, utilized on publicly

---

[37] For example, DSMCi used: (1) Oracle Systems' relational database management system; (2) the Virage VideoLogger software; (3) Netscape's Enterprise Webserver; and (4) Verity-brand search and retrieval software. For a complete discussion of this third-party software, see SMF ¶ 55.

[38] See cases discussed at nn. 31 - 36.

accessible websites, and published in thirteen patents.  Summary judgment should be granted

because DSMCi has not sufficiently identified its trade secrets to distinguish them from

information generally known in the trade and previously utilized by Convera.

### B.  DSMCi HAS NOT PRESENTED A GENUINE ISSUE OF MATERIAL FACT TO SHOW IMPROPER MEANS, USE OR DISCLOSURE

DSMCi has failed to establish two additional elements required for recovery under the

UTSA: (1) that Convera acquired DSMCi's putative trade secrets by improper means; or (2) that

Convera improperly used or disclosed any trade secrets.[39]

#### 1. Convera's Access To NGTL's Website And Database, Using Passwords Provided By NGTL, Is Not "Improper Means."

Under the UTSA, the term "improper means" is defined as "theft, bribery,

misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage

through electronic or other means."[40]  Undisputed record evidence establishes that any

information Convera acquired was not through any of these methods, but by accessing the NGTL

Database and Website with passwords provided by NGTL in accordance with the requirements

and warranties in the Convera/NGTL MSA.  And this access was obtained after (1) Convera had

openly requested such information at a meeting with NGTL and DSMCi representatives; and (2)

---

[39] According to D.C. Code § 36-401(2): "Misappropriation means:

    (a) Acquisition of a trade secret of another by a person who knows or has reason to know that the secret was acquired by improper means; or

    (B) Disclosure or use of a trade secret of another without express or implied consent by a person who:

    . . . . .

    (ii) At the time of disclosure or use, knew or had reason to know that the trade secret was:

    . . . . .

    (III) Derived from or through a person who owned a duty to the person seeking relief to maintain its secrecy or limit its use".

[40] D.C. Code § 36-401(1).

Convera and DSMCi had executed a nondisclosure agreement covering any confidential information exchanged during the NGTL Database migration.  Moreover, the DSMCi/NGTL ISA expressly contemplates migration of the NGTL Database by July 2001.

Because migration of the NGTL Database into *Screening Room* required picking approximately 30 million data elements out of the NGTL Database and inserting them into the *Screening Room/NGTL* database, the Convera/NGTL MSA required that NGTL provide Convera with a copy of the NGTL Database and its schema as a condition to Convera's obligation to migrate the NGTL Database into *Screening Room*.  Convera openly requested and received from NGTL the access to the NGTL Database and Website it required to efficiently transfer the NGTL Database to Convera's *Screening Room* product, and DSMCi tracked Convera's access to the website through its logs.  In the Convera/NGTL MSA, NGTL represented and warranted that all "material provided to Convera by NGTL or on its behalf may be reproduced and otherwise utilized as necessary" by Convera in its work with NGTL.[41]

Consistent with the Convera/NGTL MSA requirements and warranties, Convera accessed the NGTL Database by using the password "icepick," which had been provided to Convera by NGTL.  Similarly, Convera accessed the NGTL Website (1) with the Wart username/password combination from May 14, 2001 until August 16, 2001 when the Wart username/password combination failed; and (2) with a different username/password combination[42] from August 16, 2001 until NGTL asked Convera to stop accessing the website on August 21, 2001.  This access to the NGTL Database and Website, requested openly by Convera and provided by NGTL in

---

[41] SMF ¶ 18.
[42] For purposes of summary judgment, this includes access using the MRice username/password combination, as well as the disputed "AIQC" username/password combination that DSMCi argues Convera used on one occasion.

accordance with the requirements and warranties in the Convera/NGTL MSA, does not meet the statutory definition of improper means,[43] particularly in light of the nondisclosure agreement executed between Convera and DSMCi.

### 2. No Evidence that Convera has Improperly Used or Disclosed Any DSMCi Information

Summary judgment is appropriate where, as here, DSMCi has produced no admissible evidence that Convera used or disclosed any DSMCi trade secrets.[44]  Uncontroverted record evidence establishes that (1) NGTL dictated the look and feel and functionality that Convera delivered in its temporary hosting of the *Screening Room/NGTL* database; (2) the primary functionality required by NGTL – the ability to search and retrieve its digitized video footage at the clip level over a web browser – were available in *Screening Room* products well before May *2001*; (3) no Convera product has incorporated DSMCi software, code or database schema; and (4) Convera used information it garnered from accessing the NGTL Database and Website to locate the 30 million data elements in the NGTL Database for migration into *Screening Room*.

According to DSMCi, its logs have recorded every access and function request made by Convera on the NGTL Website. And during discovery Convera produced to DSMCi: (1) sixteen iterations of the *Screening Room/NGTL* database schema, covering all steps in its development from the *Screening Room/NASA* starting point until wll after the September 2001 delivery to NGTL; (2) *SR/Browse* source code and all software customizations made for NGTL; (3) DataMover scripts, written and used by Convera engineers to pick the nearly 30 million data elements out of the NGTL Database and insert them into the *Screening Room/NGTL* database;

---

[43] *See* D.C. Code § 36-401(1) ("theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means").
[44] *E.g.*, *On-Line Tech., Inc.*, 386 F.3d at 1143-44.

and (4) FrameMover scripts, written and used by Convera engineers to migrate approximately 10-15% of the NGTL keyframe files. DSMCi was also given a username/password combination for accessing the *Screening Room/NGTL* Website during the entire time it was hosted by Convera, and DSMCi requested and received other Convera documents and deposed Convera engineers and other employees.

Despite DSMCi records and this extensive discovery, DSMCi has yet to identify any particular DSMCi trade secret used or disclosed by Convera. Indeed, DSMCi has failed to even allege a violation of the nondisclosure agreement it executed with Convera. This trade secret claim, based on access to a publicly available website built with a generally known combination of third-party software for purposes of effectuating a migration called for in DSMCi's contract, is utterly without merit. Accordingly, summary judgment should be granted dismissing DSMCi's trade secret misappropriation claims.

## II. CONVERA SHOULD BE GRANTED SUMMARY JUDGMENT ON DSMCI'S CLAIM OF COPYRIGHT INFRINGEMENT

### A. NO COPYRIGHT INFRINGEMENT OF NGTL DATABASE SCHEMA

DSMCi alleges that Convera infringed its copyrighted MAS software, and appears to include the database schema in its copyright infringement claims.[45] Copyright registration is a jurisdictional prerequisite to a copyright infringement action.[46] On March 1, 2002, DSMCi received a Certificate of Registration for the MAS Version 1 software used to host the NGTL Website. The software registered by DSMCi includes approximately 240 HTML files containing server-side JavaScript and client-side HTML and JavaScript. It does not include the schema for

---

[45] Compl. ¶¶ 20, 21 & 30.
[46] 17 U.S.C. § 411(a); *I.M.S. Inq. Mngmt. Sys. v. Berk. Inf. Sys., Inc.*, 307 F.Supp.2d 521, 526 (S.D.N.Y. 2004).

the NGTL Database. Accordingly, any claims for copyright infringement of the NGTL Database schema must be dismissed for lack of subject matter jurisdiction.

Even if registered, however, copying the schema to extract data from a database for purposes of migration is not infringement.[47]  Copyright laws should not be used to hold data hostage by blocking "access to data that … was not created or obtained by the copyright owner."[48]  It is undisputed that the NGTL Database, with its digitized video, metadata, and keyframes, was owned by NGTL.  And DSMCi knew from the beginning that its hosting was temporary and that a migration would occur, necessitating the extraction and migration of the NGTL data out of the NGTL Database that DSMCi had assembled.

## B.   DSMCi HAS NOT PRESENTED A GENUINE ISSUE OF MATERIAL FACT OF COPYING OF PROTECTABLE ELEMENTS

To recover on its claim of copyright infringement, DSMCi must prove unauthorized copying of original elements of its MAS Version 1 software.[49]  Computer programs are protected by copyright law, but valid registration[50] of a computer program does not mean that each element of the program is protectable; elements are protectable only to the extent that they represent the expression of the programmer's original ideas.[51]  To prevail on its claims, DSMCi must prove not

---

[47] *Princess Cruises, Inc. v. Amrigon Ent., Inc.*, 51 Fed. Appx. 626, 2002 WL 31190182 (9th Cir. Oct. 2, 2002) (unpublished); *see, e.g., Bowers v. Baystate Tech., Inc.*, 320 F.3d 1317, 1325 (Fed Cir. 2003) (discussing long-standing fair use exception for reverse engineering or intermediate copying of computer code to discern the unprotectable ideas in a computer program); *Batemen v. Mnemonics, Inc.*, 79 F.3d 1532, 1540n.18 (11th Cir. 1996) (same).

[48] *Assess. Tech. of WI, LLC*, 350 F.3d at 641.

[49] *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Whitehead v. CBS/Viacom, Inc.*, 315 F.Supp.2d 1, 8 (D.D.C. 2004).

[50] Convera disputes that DSMCi has a valid copyright, but this issue involves disputed facts, which must be assumed in DSMCi's favor for purposes of this motion.

[51] *Computer Associates Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 702-03 (2nd Cir. 1992); *see also Feist*, 499 U.S. at 348 ("The mere fact that a work is copyrighted does not mean that every element of the work may be protected.").

only that any allegedly copied portion of its MAS client-side code is original and protectable, but also that the "the copying of the copyrighted material was so extensive that it rendered the offending and copyrighted works substantially similar."[52]

This Court and others have recognized that summary judgment should be granted where plaintiff fails to show a genuine issue of fact that the ideas and expressive elements of the works are substantially similar.[53] And a district court may determine noninfringement as a matter of law on summary judgment where the similarity concerns only noncopyrightable elements of a plaintiff's work.[54] This is such a case.

Because Convera had access only to the client-side code,[55] DCMCi must prove that Convera copied *original elements* in the client-side code that DSMCi used to generate the user interface screens (or webpages) for the NGTL Website. This is a difficult task. Courts have deemed user interfaces to be nonliteral elements of computer programs, which may be entitled to protection as a compilation *only* if they are compiled in a creative or unique way, but this protection is thin.[56] The "thin" copyright protection afforded nonliteral elements means that plaintiff must prove that the works are virtually identical to establish infringement.[57] Because the

---

[52] *Lotus Dev. Corp. v. Borland Int'l., Inc.*, 49 F.3d 807, 813 (1st Cir. 1995), *aff'd* 516 U.S. 233 (1996).

[53] *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1472 (9th Cir. 1992), *cert. denied* by *B.B. Asset Mngmt., Inc. v. Symantec Corp.*, 506 U.S. 869 (1992); *Whitehead*, 315 F. Supp. 2d at 12.

[54] *ILOG, Inc. v. Bell Logic, LLC*, 181 F.Supp.2d 3, 14 (D. Mass. 2002) (granting summary judgment because individual copied elements not copyrightable and, in aggregate, constitute method of operation).

[55] *See Lotus Dev. Corp.*, 49 F.3d at 813 (absent direct evidence of copying, plaintiff must show access and substantial similarity).

[56] *MiTek Holdings, Inc. v. Arce Eng. Co.*, 89 F.3d 1548, 1558-59 (11th Cir. 1996); *Apple Comp., Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446 (9th Cir. 1994), *cert. denied*, 513 U.S. 1184 (1995).

[57] *Mitek*, 89 F.3d at 1558-59; *Apple*, 35 F.3d at 1446; *see also* 4 Melville B. Nimmer and David Nimmer, Nimmer on Copyright § 13.03[B][2][b] (2005).

original aspect of a work lies in its literal expression, "only a very close similarity, verging on the identical, will suffice to constitute an infringing copy."[58]

Despite extensive discovery, DSMCi has presented no colorable evidence of copying. And DSMCi has presented no evidence the Convera's user interface screens were virtually identical to those generated by DSMCi.  When asked what materials Convera had copied, DSMCi simply responded that Convera had "reverse engineer[ed DSMCi's code] into a look and feel that then became theirs."[59]  Indeed, establishing virtual identity seems impossible since DSMCi has admitted that Convera did not, indeed could not, literally copy the DSMCi client-side code.

Nor is there evidence that DSMCi's client-side code was an original compilation or that DSMCi, as opposed to NGTL, was responsible for any creativity that went into the look and feel of the NGTL Website.  The look and feel involves the font, colors, and general page layout selected for the user interface screens.  But the evidence demonstrates that NGTL dictated the basic look and feel requirements first to DSMCi and then to Convera.  Indeed, DSMCi did not register the user interface screens for the NGTL Website as its creative visual work.  And the only copyright notice displayed on the website user screens is "© 2000 National Geographic Television Library, Inc." on the NGTL LOGIN page, placed there by DSMCi.   In short, there is no evidence that DSMCi's client-side code is anything more than standard HTML coding and JavaScript used to implement the look and feel required by NGTL.  If the user interface itself is not protectable, the standard coding used to create that user interface is likewise not protectable.

Where, as here, plaintiff has alleged only nonliteral copying of nonliteral elements, most

_____

[58] Nimmer at §13.03[B][2][b].
[59] SMF ¶ 44.

courts determine substantial similarity by using the "abstraction-filtration-comparison" test first set forth by the Second Circuit in *Computer Assocs., Int'l, Inc. v. Altai, Inc.*[60]  And in determining substantial similarity in cases involving alleged infringement of software code, courts rely on expert testimony because technical similarity is generally outside the purview of the layperson-observer test historically used to compare literary works.[61]  This is particularly true where, as here, virtual identity is required.

But DSMCi has not sufficiently identified its protectable elements, nor has it presented any evidence, expert or otherwise, to even allow this Court to begin to apply the abstraction-filtration-comparison test.  And DSMCi's identification of the "overall look and feel" as its protectable elements fares no better than the "design, selection and arrangement of screens, directories, macros and other data" found fatally defective to plaintiff's claim in *Maddog Software, Inc. v. Sklader*.[62]  Without any evidence from DSMCi directed to the abstraction step of the *Altai* test, this Court cannot discern what might be original about the elements of MAS Version 1 so that they fall within the scope of copyright protection.[63]  Because DSMCi bears the ultimate burden of proof on this issue, this is fatal to its claim.[64]

### III.    SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING DMCA CLAIMS RAISED IN COUNT III OF THE COMPLAINT

#### A.    USING USERNAME/PASSWORD COMBINATIONS IS NOT "CIRCUMVENTION" WITHIN MEANING OF § 1201(A)

DSMCi claims that Convera violated the DMCA by circumventing "technical measures

---

[60] *Altai, Inc.*, 982 F.2d at 703; *Ilog, Inc.*, 181 F.Supp.2d. at 10.
[61] *See Whelan Assoc., Inc. v. Jaslow Dental Labs, Inc.*, 797 F.2d 1222, 1233 (3rd Cir. 1986), *cert. denied* 479 U.S. 1031 (1987) (traditional "ordinary observer" test of doubtful value in cases involving computer programs).
[62] *Maddog Software, Inc. v. Sklader*, 382 F.Supp.2d 268, 279 (D.N.H. 2005).
[63] *Id.*
[64] *Id.*

put into place by DSMCi to control access to its protected works,"[65] and points to Convera's

access to the NGTL Database and Website as evidence of circumvention.[66] But in *Egilman v.*

*Keller & Heckman, LLP*, this Court recently held that "using a username/password combination

as intended – by entering a valid username and password, albeit without authorization – does not

constitute circumvention under the DMCA."[67]  This is true even if the passwords had been

unauthorized or stolen because the DMCA does not prohibit unauthorized access, but only

*circumvention* leading to unauthorized access.  To hold otherwise would do violence to the

meaning of circumvention.[68]

It is undisputed that Convera used valid username/passwords to access the NGTL

Website and used a valid password to open the NGTL Database.  Convera's use of these

passwords was authorized by NGTL, which had control over registering and assigning

username/password combinations to website users.  But even if unauthorized, *Egilman* holds that

use of valid passwords to access the password-protected website is not circumvention in

violation of § 1201(a).

Accordingly, assuming for purposes of this motion that DSMCi can prove that (1) access

to the NGTL Database or Website provided access DSMCi's "protected works" and (2) the

NGTL-controlled password issuance process was put in place by DSMCi to restrict access to

such works, summary judgment should be granted because Convera's use of valid passwords is

not circumvention within the meaning of § 1201(a) as a matter of law.

---

[65] Compl. ¶ 32.
[66] SMF ¶ 116.
[67] *Egilman v. Keller & Heckman, LLP*, 401 F.Supp.2d 105, 113 (D.D.C. 2005); *see also I.M.S.*
*Inq. Mngmnt. Sys.*, 307 F.Supp.2d at 532.
[68] *See Egilman*, 401 F.Supp.2d at 113-14; *I.M.S. Inq. Mngmnt. Sys.*, 307 F.Supp.2d at 532.

### B. NO EVIDENCE OF INTENTIONAL REMOVAL IN VIOLATION OF § 1202

DSMCi claims that Convera also violated the DMCA by intentionally removing and altering copyright management information relating to DSMCi, including specifically DSMCi's copyright notice."[69]  DSMCi appears to base this claim on the fact that, when Convera hosted the *Screening Room/NGTL* Website, it did not include DSMCi copyright information in the client-side code of the webpages that Convera created for NGTL.

DSMCi appears to rely on section 1202(b)(1), which prohibits the intentional removal of copyright management information knowing that such removal will induce, facilitate or conceal copyright infringement.  But this provision applies only "to the removal of copyright management information on (or from) a plaintiff's product or original work."[70]  DSMCi does not claim that Convera removed its copyright management information from DSMCi's own product or original work, i.e. the NGTL Website hosted by DSMCi, but from what DSMCi argues was a nonliteral copy of that website when Convera hosted the *Screening Room/NGTL* Website.  As such, DSMCi fails to state a claim under § 1202(b)(1) as a matter of law.

Nor can DSMCi support a claim that Convera violated  § 1202(b)(3), which prohibits the copying of protected works "knowing that copyright management information has been removed or altered without authority of the copyright owner or the law."[71]  First, DSMCi's argument that Convera engaged in nonliteral copying of the look and feel of the NGTL Website, even if true, will not support a claim under § 1202(b)(3) because § 1202(b)(3) applies only when copyright

---

[69] Compl. ¶33.
[70] *Monotype Imaging, Inc. v. Bitstream, Inc.*, 376 F.Supp.2d 877, 893 (N.D. Ill. 2005) (*citing Kelly v. Arriba Soft Corp.*, 77 F.Supp.2d 1116, 1122 (C.D. Cal. 1999); *aff'd in part, rev'd in part*, 336 F.3d 811 (9th Cir. 2003)).
[71] 17 U.S.C. § 1202(b)(3).

management information is removed directly from a literal copy of the work.[72]   And DSMCi has admitted that Convera did not literally copy DSMCi client-side code but used a different program to create its webpages.

Second, DSMCi alleges that, although Convera could not literally copy DSMCi client-side code to create *Screening Room/NGTL* webpages, it did download and take some client-side code from the NGTL LOGIN page.  But the NGTL LOGIN page does not contain any DSMCi copyright management information. The only copyright management information on that webpage is that of NGTL.  Moreover, the client-side code for the NGTL LOGIN page contains no DSMCi copyright management information. Convera simply cannot have altered or removed copyright management information that did not exist in the first place.  Thus, even if DSMCi allegations are true, this is not a violation of § 1202(b)(3).

The client-side code of some other NGTL webpages produced in discovery contains DSMCi copyright management information.  But there is no evidence that Convera was aware of this information or that anyone at Convera even looked at client-side code on any page other than the NGTL LOGIN page, both of which are essential to proving claims under § 1202(b).[73]  And despite extensive discovery, there is no evidence that Convera employees copied client-side code from any webpage where the client-side code contains DSMCi copyright management information.  In contrast, there is uncontroverted testimony that Convera wrote custom code

---

[72] *Cf. Arriba Soft Corp.*, 77 F.Supp.2d at 1122 (copyright management information did "not appear on the images themselves").

[73] *See Gordon v. Nextel Comm.*, 345 F.3d 922, 926-27 (6th Cir. 2003) (granting summary judgment on multiple § 1202(b) claims in absence of proof that defendants removed or knew that removal would induce or conceal infringement); *cf. Ward v. Nat. Geo. Soc.*, 208 F.Supp.2d 429, 449-50 (S.D.N.Y. 2002) (granting summary judgment on § 1202(a) claims where no credible evidence that defendant knew that placing its copyright notice on pages containing plaintiff's copyrighted images would convey false copyright information).

consistent with NGTL's look and feel requirements.  Under these circumstances, this Court

should grant summary judgment on DSMCi's § 1202(b) claims.

## IV.  CONVERA SHOULD BE GRANTED SUMMARY JUDGMENT DISMISSING CONSPIRACY CLAIMS

### A.    THIS COURT SHOULD DISMISS THE VBCA CLAIMS

#### 1.  The UTSA Prempts VBCA Claims Predicated on Trade Secret Misappropriation

DSMCi claims that Convera and NGTL violated the VBCA by conspiring "to reverse

engineer, misappropriate, copy … and circumvent DSMCi's rights in its trade secrets."[74]

Recently, in *Microstrategy, Inc. v. Business Objects, S.A.*,[75] the Federal Circuit held that the

Virginia UTSA preempts VBCA claims where the VBCA claim is predicated on the

misappropriation of trade secrets.  In affirming the decision by the Eastern District of Virginia,

the Federal Circuit relied on the preemption clause of the Virginia UTSA, which is identical to

that of D.C:[76]

> A.  Except as provided in subsection B of this section, this chapter
> displaces conflicting tort, restitutionary, and other law of this
> Commonwealth providing civil remedies for misappropriation of a
> trade secret.
>
> B.  This chapter does not affect:
> 1. Contractual remedies whether or not based upon
> misappropriation of a trade secret; or
> 2. Other civil remedies that are not based upon misappropriation
> of a trade secret; or
> 3. Criminal remedies, whether or not based upon misappropriation
> of a trade secret.

The *Microstrategy* court held that, "[w]hen read together, sections A and B preempt *all*

claims for relief, including both common law *and* statutory causes of action, if they provide a

---

[74] Compl. ¶ 55.
[75] *Microstrategy, Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1363-64 (Fed. Cir. 2005).
[76] *Compare* Va. Code § 59.1-341 *with* D.C. Stat. § 36-407.

civil remedy for misappropriation of trade secrets, *unless* they are contractual or criminal in nature."[77]  Because plaintiff specifically predicated its conspiracy claim on alleged trade secret misappropriation, its conspiracy claim was preempted.[78]  Like the plaintiff in *Microstrategy,* DSMCi predicated its VBCA claim on the misappropriation of trade secrets.  Because the D.C. UTSA. was intended to "make uniform the law with respect to trade secrets among the District of Columbia and those states enacting it,"[79] this Court should hold the VBCA claim preempted.

## 2.  VBCA Does Not Apply To Claims Brought Under D.C. Law

In *Beydoun v. Clark Construction Int'l, LLC,*[80] the Fourth Circuit held that plaintiff's VBCA should be dismissed where its claims are governed by the laws of another state.[81]  Like the plaintiff in *Beydoun,* DSMCi brought this action in D.C. federal court under D.C. law.[82]  By invoking D.C. substantive law, DSMCi seeks punitive damages without the $350,000 statutory cap imposed by Virginia law.[83]  In its Third Amended Complaint, DSMCi added a VBCA claim, which allows for treble damages, as its sole claim under Virginia law.  DSMCi should not be able to cherry-pick among Virginia statutes.  Unless Virginia law applies to its claims, the VBCA should be dismissed.

Even if the VBCA could be applied to the events alleged in this case, summary judgment should be granted.  To prevail on a VBCA claim, plaintiff must prove by clear and convincing

---

[77] *Microstrategy,* 429 F.3d at 1363.

[78] *Id.*

[79] D.C. Code § 36-408; *Cat. & Chem. Serv., Inc. v. Global Ground Support,* 350 F.Supp.2d 1 (D.D.C. 2004).

[80] *Beydoun v. Clark Construction Int'l., LLC,* 72 Fed. Appx. 907 (4th Cir. 2003) (unpublished); *see also Paper Sales Corp. v. James River Corp. of Va.,* 1990 WL 96097 (S.D.N.Y. July 9, 1990), *aff'd* 930 F.2d 909 (2nd Cir. 1991) (unpublished).

[81] *Id.* at 916 n. 5.

[82] Compl. ¶¶ 1, 26-28, 49-51.

[83] Va. Code § 8.01-38.1.

evidence that: (1) defendants acted intentionally, purposefully, and without lawful justification, and that such actions injured plaintiff's business;[84] and (2) the conduct was "directly aimed toward damaging the business, trade, reputation or profession: the injury must not be the result or secondary effect of an action taken for mere personal gain."[85] Summary judgment should be granted where the evidence supporting a VBCA claim amounts to speculation.[86] Because there is no evidence beyond DSMCi's speculation, imposed upon a normal business relationship between Convera and NGTL together with DSMCi's disappointment when NGTL decided not to extend its hosting contract, summary judgment should be granted.

### B.  D.C. COMMON-LAW CONSPIRACY CLAIMS SHOULD BE DISMISSED

In D.C., civil conspiracy requires: (1) an agreement by two or more persons; (2) to act unlawfully; (3) in furtherance of common scheme; (4) causing injury.[87] Under D.C. law, a claim for civil conspiracy requires proof of a separate actionable tort.[88] Because DSMCi has failed to present a genuine issue of material fact supporting its trade secret misappropriation claims, the conspiracy theory must also fail as a matter of law.[89] Moreover, there is no evidence of an unlawful agreement, beyond the speculation DSMCi imposes on a normal business relationship. This is insufficient.[90]

## V. SUMMARY JUDGMENT SHOULD BE GRANTED ON SETOFF

Under D.C. law, when a plaintiff settles with a party whose liability has not been determined, "the court awards the nonsettling defendant a credit against the verdict in the amount

---

[84] *Williams v. Dominion Tech. Partners, LLC*, 265 Va. 280, 290, 576 S.E.2d 752, 757 (2003).
[85] *Saliba v. Exxon Corp.*, 865 F.Supp. 306, 314 (W.D. Va. 1994), *aff'd*, 52 f.3d 322 (1995).
[86] *Id.* at 313-14.
[87] *Weishapl v. Sowers*, 771 A.2d 1014, 1023 (D.C. 2001).
[88] *Id.*; *Exec. Sand. Shoppe, Inc. v. Carr Rlty Corp.*, 749 A.2d 724, 738 (D.C. 2000).
[89] *Exec. Sand. Shoppe, Inc.*, 749 A.2d at 738.
[90] *Weishhapl*, 771 A.2d at 1023-24.

of the settlement, dollar-for-dollar (*pro tanto*)."[91]  The rationale behind the *pro tanto* credit is to ensure that plaintiff does not recover more than the loss suffered regardless of the multiplicity of parties or theories that plaintiff pursues.[92]  In December 2005, NGTL settled with DSMCi for a specified sum.  NGTL did not admit liability, and DSMCi dismissed its claims against NGTL.  Accordingly, should any issues remain for trial, Convera is entitled to a *pro tanto* setoff of the amount of the NGTL/ DSMCi settlement.

**CONCLUSION**

For the foregoing reasons, Convera respectfully requests that this Court grant its motion for summary judgment.

Dated:  April 26, 2006.

Respectfully submitted:

_____/s/_____
Virginia W. Hoptman
James S. Kurz
Erin L. Roberts
Audra Hale-Maddox
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
8065 Leesburg Pike, 4th Floor
Tysons Corner, Virginia  22182
(703) 394-2230
(703) 918-2244 Fax

*Attorneys for Convera Corporation*

---

[91] *Berg v. Footer*, 673 A.2d 1244, 1248-49 (D.C. 1996) (*citing Snowden v. D.C. Transit Sys., Inc.*, 454 F.2d 1047, 1048-49 (D.C. Cir. 1971)); *see, e.g., Hall v. General Motors Corp.*, 647 F.2d 175, 184 (D.C. Cir. 1980).
[92] *Kassman v. American Univ.*, 546 F.2d 1029, 1033 (D.C. Cir. 1976) (*quoting Snowden*, 454 F.2d at 1048).

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **DSMC, Inc.** | ) |
| | ) |
| versus | ) Case #: 1:01CV02284 (EGS) |
| | ) |
| **CONVERA CORPORATION** | ) Judge Emmet G. Sullivan |
| | ) |

## CONVERA CORPORATION'S STATEMENT OF MATERIAL FACTS NOT GENUINELY DISPUTED

James S. Kurz
Virginia W. Hoptman
Erin L. Roberts
Audra Hale-Maddox
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
8065 Leesburg Pike, 4th Floor
Tysons Corner, Virginia  22182
(703) 394-2230
(703) 918-2244 Fax

*Counsel for Convera Corporation*

## TABLE OF CONTENTS

I.      Parties and NGTL/DSMCi Settlement................................................................................1

    Convera Corporation...........................................................................................................1
    DSMC, Inc. ..........................................................................................................................1
    NGT Library, Inc. ...............................................................................................................1
    NGTL/DSMCi December 2005 Settlement........................................................................2

II.     NGTL's Program for NGT Film Library ..........................................................................2

    DSMCi/NGTL Integration Services Agreement................................................................2
    Convera's Contract with NGTL...........................................................................................4

III.    Convera's Screening Room Software ...............................................................................5

    The Screening Room Product .............................................................................................5
    Screening Room Development and Introduction.................................................................5
    Screening Room for NGTL..................................................................................................6

IV.    DSMCi's Media Archive System ......................................................................................7

    Media Archive System Version 1 .......................................................................................7
    DSMCi Public Demonstrations of MAS Version 1 ...........................................................8
    Copyright Registration........................................................................................................9
    Database Schema for the NGTL Database.........................................................................11
    MAS Version 1 Design and Functions .............................................................................12

V.     May 10th Meeting and Surrounding Events ....................................................................13

    May 10th Meeting: NGTL-Convera-DSMCi....................................................................14
    Convera/DSMCi Mutual Nondisclosure Agreement ........................................................15

VI.    Convera's Phase 1 Work for NGTL .................................................................................16

    Preparing the Screening Room/NGTL database...............................................................16
    Database Migration............................................................................................................16
    Custom User Interface Software and Software Modifications for NGTL Project.....................20

VII.   Convera Access to the NGTL Website .............................................................................21

    MAS Logs and Netscape Web Logs .................................................................................21
    Convera NGTL Website Access, August 16-20 ................................................................23

I.      **Parties and NGTL/DSMCi Settlement**

**Convera Corporation**

1.      Convera Corporation is a Delaware corporation with its corporate offices in Vienna, Virginia.  Convera was formed in December 2000 through the combination of Excalibur Technologies Corporation and the Interactive Media Services division of INTEL Corporation.  Ex. 4.

2.      In 2001 Convera's business was software development.  The company's principal software product, *RetrievalWare*, delivered search capabilities required by major corporations and government agencies, including the intelligence community.  Convera developed, marketed and supported its software.  Ex. 4.

**DSMC, Inc.**

3.      DSMC, Inc. (DSMCi) started business as a Maryland corporation in 1995 with its office in Beltsville, Maryland.  In its federal income tax filing for 2001, DSMCi identified its business activity as "Consulting" and the product or service as "Communications." Ex. 27.

4.      DSMCi conducts no business today.  (Stated by Duane Shugars in April 18, 2006 continuation of 30(b)(6) deposition.  Transcript not available.)

**NGT Library, Inc.**

5.      NGT Library, Inc. (NGTL) is a Delaware corporation with its offices in Washington, D.C.  As a wholly owned subsidiary of National Geographic Television, Inc., NGTL managed, preserved and distributed film footage produced by National Geographic Television and used by the National Geographic Channel.   NGTL Ans. ¶ 5.

**NGTL/DSMCi December 2005 Settlement**

6.      In December 2005 NGTL settled with DSMCi. NGTL admitted no liability. DSMCi and NGTL dismissed all claims against each other and NGTL paid DSMCi a specified sum. Ex. 49.

## II.      NGTL's Program for NGT Film Library

7.      NGTL developed a plan for moving many of the film assets produced by National Geographic Television to a searchable Internet website. First, NGTL planned to prepare a database of digitized footage and associated metadata, and temporarily host it on the Internet. Second, NGTL planned to select and implement permanent video management software. Third, NGTL planned to move the Internet website in-house. Ex. 51; Ex. 50 at 97-98 (Crane TR).

8.      While hosted by DSMCi, the NGTL Website had a few hundred registered users; the website's purpose was to market and sell National Geographic Television's footage around the world. Ex. 52 at 106-08, 113-14, 170-71 (Grossman TR) and Ex. 55.

**DSMCi/NGTL Integration Services Agreement**

9.      In November 2000, NGTL signed a contract with DSMCi to construct searchable video database and temporarily host it on the Internet. The contract, identified as the Integration Services Agreement ("DSMCi/NGTL ISA"), has an effective date of September 13, 2000. Ex. 1.

10.      Under the DSMCi/NGTL ISA, DSMCi was to (1) digitize approximately 2000 hours of NGTL video footage, (2) create a searchable database of the standard metadata associated with the digitized footage, together with additional metadata containing Archive Impact's detailed descriptions of the tens of thousands of NGTL video clips, and (3) temporarily host the searchable database on the Internet. Ex. 1.

11.    NGTL specified for DSMCi the appearance and functionality of the NGTL Website.  The DSMCi/NGTL ISA requires that DSMCi consult with NGTL to develop the user interface:

> "One week of consulting services by Integrator to develop, review with NGTL, modify and finalize the structure, graphic design elements, and functionality requirements for the user interface, fulfillment modules for delivery of encoded Footage, and reports for the DMAS."

Ex. 1 (Ex. A § 1); Ex. 52 at 155-160 (Grossman TR).

12.    The DSMCi/NGTL ISA requires that DSMCi deliver to NGTL the "final NGTL Database backup."  It also required DSMCi to deliver to NGTL each month a back-up copy of the NGTL Database.  Ex. 1 (Ex. C, § 2(a) and (d); Ex. F § 1(b))

13.    The DSMCi/NGTL ISA called for DSMCi to transition the NGTL Database, either in-house or to NGTL's "Designee" (defined as an "entity providing services to NGTL, specifically related to this project."  Ex. 1 § 8(b)(i)(E).

14.    DSMCi's temporary hosting responsibilities for the NGTL Website under the DSMCi/NGTL ISA ended in July 2001.  NGTL and DSMCi agreed to two extensions of the website hosting, first to August 15, 2001, and then to September 15, 2001.  Ex. 25 at 186-187 (July 2004 DSMCi 30(b)(6) TR).

15.    Convera was not a party to the DSMCi/NGTL ISA.  NGTL did not provide Convera with a copy of the DSMCi/NGTL ISA, and Convera did not see the contract document until this litigation commenced.  Other than assurances by NGTL's Dean Watts in early June 2001 that the DSMCi/NGTL ISA gave NGTL the right to grant Convera access to the NGTL Website, NGTL did not discuss the DSMCi/NGTL ISA with Convera.  Ex. 13 at 247-48

(Henderson TR); Ex. 18 at 148-49 (Doyle TR); Ex. 7 at 194-95 (Chen TR); Ex. 19 at 27 (Teti

TR); Ex. 15 at 109-10 (Back TR); Ex. 59 at 128 (Watts TR).

**Convera's Contract with NGTL**

16.     NGTL and Convera signed their contract on July 20, 2001.  The contract

documents include four agreements:  (1) Master Services Agreement; (2) Statement of

Work/Phase One (SOW/1); (3) *Screening Room* Software License; and (4) Professional Service

Agreement (collectively "Convera/NGTL MSA").   Ex. 2 (Ex. A); Ex. 18 at 24-25, (Doyle TR).

17.     The Convera/NGTL MSA required Convera to (i) migrate and integrate

the NGTL Database into its proprietary software, *Screening Room*; (ii) add NGTL-requested

functionality to operate *Screening Room*; and (iii) temporarily host the *Screening Room/NGTL*

Website.  Ex. 2 (Ex. A).

18.     In the Convera/NGTL MSA, NGTL represented and warranted to Convera

that all "material provided to Convera by NGTL or on its behalf may be reproduced and

otherwise utilized as necessary by Convera" in its work with NGTL.  Ex. 2 ¶ 6(b).

19.     The SOW/1 states that for the migration of the NGTL Database to the

*Screening Room* database, Convera will

- Acquire the NGTL data schema for Metadata and user profiles
- Acquire the NGTL Oracle DB backup data
- Extract the data from the Oracle backup and integrate into [*Screening Room* Relational Database (SR RDB)]
- Associate the backup Metadata with the Pre-existing Digital Assets
- Transfer Other Metadata to the SR RDB
- Do quality review and testing with NGTL to insure accurate transfer of the Pre-existing Digital Assets, Other Metadata, and other data

Ex. 2 (Ex. A at 3).

4

20.     From July 2001 to July 2003, Convera hosted the *Screening Room/NGTL* Website at a third-party facility in Hillsboro, Oregon.  In July 2003, NGTL transferred the hosting of the website from Convera to its own in-house facilities in Washington, D.C.   Ex. 18 at 32-33 (Doyle TR); Ex. 13 at 334 (Henderson TR); Ex. 61 at 408-409 (White TR).

### III.   Convera's *Screening Room* Software

#### The *Screening Room* Product

21.     *Screening Room* is a video cataloging, previewing and retrieval system that manages significant video libraries.  Ex. 6 ¶ 5 (Rose Aff.).

22.     As of December 2000, *Screening Room* included four core components: *SR/Capture*, *SR/Edit*, *SR/Browse*, and the Video Analysis Engine.  A version of Convera's *RetrievalWare* search software was bundled as part of *Screening Room* to provide the product's search capability.  Ex. 6 ¶ 9 and Aff. Ex. 1 (Rose Aff.).

23.     Through *SR/Browse*, *Screening Room* interfaces with the Internet Explorer and Netscape web browsers.   Convera implemented *SR/Browse* as a set of code modules written in Visual Basic and JavaScript.  This code executed on Microsoft's Internet Information Services webserver.  Convera developed custom webpages to work with *SR/Browse* using Microsoft's Application Server Pages (ASP) web application environment.  Ex. 6 ¶ 12 (Rose Aff.).

#### *Screening Room* Development and Introduction

24.     The *Screening Room* development team included 15-20 software engineers, as many as eight Quality Control staff, and support personnel.  Ex. 6 ¶ 17 (Rose Aff.). By 2001, the *Screening Room* development costs totaled to more than  $30 million.   Convera had a comparable $30 million investment in *RetrievalWare*.  Ex. 6 ¶ 24 (Rose Aff.)

25.     Development of *Screening Room* began in 1997.  *Screening Room* was introduced at the April 1998 National Association of Broadcasters (NAB) Conference, and *Screening Room* 1.0 was released in July 1998.  Ex. 6 ¶ 27 (Rose Aff.)

26.     Before December 2000, Convera had released *Screening Room* Version 2.2 as a customizable out-of-the-box digital-video-management software product, and had implemented a development spur to *Screening Room* for NASA (see *Screening Room* product history. Ex. 6, Aff. Ex. 1 (Rose Aff.)).  NASA uses *Screening Room/NASA* to manage video from Space Shuttle flights and the International Space Station.  The video feeds from the Shuttle and the Space Station are downloaded, then digitized and stored online.  NASA then can edit the video and related metadata.  Through an associated metadata database the entire video library can be searched, and selected video clips replayed.  A *Screening Room/NASA* user can download selected video clips for viewing using either RealNetworks' RealPlayer or Microsoft's Media Player.  Ex. 6 ¶¶ 5 & 7 (Rose Aff.).

27.     The *Screening Room/NASA* deployment in late 2000 was Convera's first implementation of a clip-level search solution.  In the October 2000 "NASA *Screening Room* Database Design Description," Jim Rose explains the *Screening Room/NASA* database. Convera incorporated the *Screening Room/NASA* schema and clip-level capabilities in *Screening Room* 2.3, released in March 2002.   Plans for this release had been underway for two years.  Ex. 6 ¶¶ 37-39 and Aff. Ex. 3 (Rose Aff.).

### *Screening Room* for NGTL

28.     In May 2001, Convera asked Jim Rose to advise on the suitability of using *Screening Room/NASA* to meet NGTL's requirements.  Rose's assessment of the best solution for NGTL was for Convera to migrate the data and keyframes from the NGTL Database that DSMCi

prepared to a *Screening Room/NGTL* database. The *Screening Room/NGTL* database would be a variation of the database Rose designed for the NASA project, but tailored to NGTL's specific requirements. Ex. 6 ¶¶ 43-44 (Rose Aff.).

29.    Convera engineers Stephen Chen and Brian Archibald used the *Screening Room/NASA* database schema as the base for the *Screening Room/NGTL* schema that Convera ultimately delivered to NGTL. Ex. 7 at 32-33 (Chen TR)

## IV.    DSMCi's Media Archive System

### Media Archive System Version 1

30.    Phil Anglin, DSMCi's chief Technology Officer, developed DSMCi's first Media Archive System (MAS) working on two contracts, one with Computer Science Corporation (CSC) in late 1998, and a contract with South Carolina Educational Television (SCEdTV) in 1998-1999. Ex. 46 at 13-14 (Anglin TR); Ex. 25 at 156 (Mar. 2002 DSMCi 30(b)(6) TR).

31.    DSMCi's MAS Version 1 included three core components: (a) the Virage VideoLogger, (b) the VDF Editor, and (c) the Web Gateway software. The Virage VideoLogger is third-party software; the VDF Editor and the Web Gateway software are DSMCi software. Ex. 46 at 29 (Anglin TR)

32.    DSMCi deposition testimony identifies three releases of the MAS Version 1 software. CSC and SCEdTV were the customers for what DSMCi identifies as Version 1.1. A Michigan company, MINDS, licensed MAS Version 1.2. NGTL was DSMCi's principal customer for MAS Version 1.3. Ex. 46 at 13, 8-19, 34 (Anglin TR)

33.    The Web Gateway software in MAS Version 1 included server-side JavaScript code, HTML pages, and some client-side JavaScript code. Anglin also prepared the

database schema for the associated metadata database. The database schema is specific to the MAS Version 1 software. Ex. 46 at 29-31, 49 (Anglin TR); Ex. 48 at 140 (Norwood TR).

34. The Web Gateway software and schema were essentially unchanged when deployed for NGTL except for the addition of the Verity search engine. Ex. 46 at 30-31, 49 (Anglin TR)

35. CSC contracted with DSMCi on behalf of NASA because the CSC contract involved integration work on a NASA/Langley website. The CSC contract terms do not in any way restrict or limit who may access the NASA/Langley website and impose no restrictions on CSC's or NASA's use or distribution of its database. Ex. 29.

36. The SCEdTV contract is a South Carolina state government contract. The contract terms are stated in the RFP. The RFP terms do not in any way limit or restrict access to SCEdTV's website and contain no restrictions on SCEdTV's use or distribution of its database. Ex. 28.

37. The contract with MINDS was a commercial contract. Its terms contain no restrictions or limitations on who may access MINDS' website, nor is there any stated restriction on MINDS use or distribution of its database. MINDS signed and returned DSMCi's proposal as the contract. Ex. 30; Ex. 25 at 12-13 (Mar. 2002 DSMCi 30(b)(6) TR).

38. NGTL was one of the last deployments of MAS Version 1. Ex. 47 at 110 (Lam TR).

**DSMCi Public Demonstrations of MAS Version 1**

39. DSMCi demonstrated MAS Version 1 at the NAB Conferences in 1999, 2000 and 2001 to any NAB attendee who stopped by the booth. The NAB Conferences each

spanned one week, with tens of thousands conference attendees each year. Ex. 48 at 27-28, 32-37 (Norwood TR).

40.     DSMCi at times prepared demonstration websites showing the MAS Version 1 features.  DSMCi developers would access the prospective customer's current website, copy the graphic look and feel, and derive a new website from those copied features. Ex. 48 at 72-75, 180-181 (Norwood TR).

### Media Archive System Version 2

41.     DSMCi refers to the MAS software after NGTL as MAS Version 2. DSMCi started development work on the MAS Version 2 software in 2000.  The move to MAS Version 2 involved a new software architecture that included use of Java Server Pages (JSP), which were not used in the MAS Version 1 software.  MAS Version 2 employed a completely different user interface and a vastly changed schema for the metadata database.  Ex. 48 at 54, 56-67 (Norwood TR); Ex. 47 at 110-112 (Lam TR)

### Copyright Registration

42.     On March 1, 2002, after amending its Complaint to include copyright infringement claims against Convera, DSMCi filed a Certificate of Registration in the U.S. Copyright Office for the MAS Version 1 software used for NGTL.   DSMCi filed a portion of the MAS Version 1 source code with the Copyright Office. Ex. 25 at 325-330 (Sept. 2004 DSMCi 30(b)(6) TR).

43.     DSMCi identifies the registered code as the code in its 'source' subfolder in the 'ngt_Gold' folder. Ex. 25 at 329-30 (Sept 2004 DSMCi 30(b)(6) TR).  This electronic folder holds DSMCi's software code for the NGTL Website.  It includes about 240 HTML files,

but does not include the schema for the NGTL Database.  Ex. 25 at 329-330 (Sept. 2004 DSMCi

30(b)(6) TR); Ex. 46 at 92-93 (Anglin TR).

44.     DSMCi acknowledges that there was no "literal copying" of the client-side

code for its webpages by Convera because the two companies created their respective webpages

in different environments.  Ex. 25 at 323-24 (Sept. 2004 DSMCi 30(b)(6) TR).  When asked

what it claimed that Convera had copied, DSMCi responded that Convera had "reverse-

engineer[ed DSMCi's code] into a look and feel that then became theirs."  Ex. 25 at 332-333

(Sept. 2004 DSMCi 30(b)(6) TR).

**The NGTL Website**

45.     From December 2000 until September 15, 2001, DSMCi hosted the NGTL

Website from its Beltsville, Maryland facility.  The website could be accessed from the Internet

at URL www.ngtlibrary.com, NGTL's domain name.  Ex. 47 at 135 (Lam TR); Ex. 54.

46.     No Internet user had access to the software code on DSMCi's internal

network.  DSMCi maintained a firewall between the Internet and its internal network.  A

'firewall' is either a physical or electronic device that blocks access.   DSMCi kept its Web

Gateway source code on its internal network behind the firewall.  Ex. 46 at 86-87 (Anglin TR).

47.     The only Web Gateway software that resided outside DSMCi's firewall

was the MediaArchive.web file and a few Java files.   Ex. 46 at 87, 91-93 (Anglin TR).

48.     Internet users could not access the MediaArchive.web file.  Ex. 46 at 87,

91-93 (Anglin TR).

49.     Convera had no access to DSMCi's internal network, and no access to the

MediaArchive.web file or the Java files.  Convera's access to the NGTL Website under the Wart

and MRice username/password combination was as a basic user.  A basic user had read-only

privileges, meaning it could see the images and visit the pages, and perform limited functions such as basic search, advanced search, search results, and shopping cart. A basic user could not access any of the administrative pages on the website. Even an administrative user had no access to the website's source code. Ex. 46 at 117 (Anglin TR); Ex. 47 at 127 (Lam TR).

50.    Convera did not attempt to determine the MediaArchive.web code or the Java code through its access to the NGTL Website. Ex. 13 at 386 (Henderson TR).

51.    The HTML and client-side JavaScripts used by DSMCi to create webpages (collectively "client-side code") were sent over the Internet to a user's computer where the code executed a browser (e.g., Internet Explorer). Any user, even a basic user, could view the client-side code from the NGTL Website. Both the Internet Explorer and Netscape browsers include a 'Right Click/View Source' feature that reveals the client-side code. That is, a user can do a 'right click' on the webpage, which displays a menu. The user next clicks on the 'View Source' option. The client-side code for the displayed web page then appears on the user's screen. Ex. 48 at 118-119 (Norwood TR); Ex. 46 at 108 (Anglin TR).

**Database Schema for the NGTL Database**

52.    Database schema is the organization of data within a database. The schema is self contained within the database, and can be determined or revealed using simple functions that are part of a database system. Database schema is often shown in a diagram, as was the case for the *Screening Room/NGTL* database schema. Ex. 48 at 141 (Norwood TR); Ex. 46 at 42 (Anglin TR); Ex. 47 at 121 (Lam TR); Ex. 8 at Ex. 1 (Chen Decl.).

53.    The schema for the NGTL Database was derived from the SCEdTV database that DSMCi prepared under its contract with SCEdTV. Ex. 48 at 140 (Norwood TR).

54.    Schema is a representation of the organization of data.  Schema is neither a software program nor object code.  Ex. 48 at 141 (Norwood TR); Ex. 47 at 121 (Lam TR).

**MAS Version 1 Design and Functions**

55.    In constructing the NGTL Database and Website, DSMCi used and integrated several third-party commercial products: (1) Oracle Systems' relational database management system to build the metadata database; (2) the Virage VideoLogger software, which provided the basic function, architecture, and interfaces for the database; (3) Netscape's Enterprise Webserver, which connected to the database and served webpages to the user; and (4) Verity-brand search and retrieval software to perform the search and retrieval functions. DSMCi's MAS integration software consists of a series of HTML and JavaScripts that link the searchable NGTL Database to the Netscape web server, allowing users to access the website from the internet, search through the database, and view selected video clips. Ex. 46 at 31-32 (Anglin TR).

56.    DSMCi's MAS Version 1 system architecture and function was largely based on the technology and interfaces of the Virage VideoLogger as integrated into MAS Version 1.  Ex. 21, ¶¶ 6-8 (Wactlar Aff.).

57.    A 1997 Virage publication described Virage's Media Manager and Browser 1.0 product.  DSMCi's MAS Version 1 closely resembles Media Manager and Browser 1.0.  Ex. 21 ¶ 9 (Wactlar Aff.).

58.    Also in 1997, Oracle Systems Corporation described in its Video Client Software Guide Release 2.1.8 a system built around the Virage VideoLogger that included the video-indexing, retrieval, and network-video-streaming functionality present in the DSMCi system.  This software guide, which was published on the Internet, provided a virtual cookbook

manual for creating a web-based video-asset management system like the solution DSMCi
provided NGTL.   Ex. 21, ¶ 10 (Wactlar Aff.).

59.    The methods required to implement a web-based, interactive, video-clip-
asset indexing, search, and management system with graphical user interface, such as DSMCi's
MAS Version 1, were published in thirteen patents issued prior to November 15, 2000.  These
patents were all filed prior to April 30, 1998. Ex. 21, ¶¶ 11-16 (Wactlar Aff.) and Aff. Ex. 1 at 6-
7 and 17-18.

60.    The referenced patents, when combined with non-proprietary information
available in public documents (e.g., books, technical journals or trade articles, and publicly
accessible technical websites) and those techniques known to those practicing database and web
programming and systems building in the relevant areas, would be sufficient to replicate those
functions described as trade secrets in DSMCi's July 2004 30(b)(6) deposition. Ex. 21, ¶ 17
(Wactlar Aff.).

61.    MediaSite.Net, introduced in 1999 by Islip Media, was a publicly
accessible system comparable to DSMCi's MAS Version 1.  The MediaSite system architecture
and database schema provided all of the fundamental functions (clip-level video search, web-
browser internet access, supporting database architecture) and a number of the same auxiliary
capabilities DSMCi used for NGTL.   Ex. 21, ¶¶ 19-22 (Wactlar Aff.).

V.    **May 10th Meeting and Surrounding Events**

**Convera/NGTL Business Relations Before May 2001**

62.    Convera, and previously Excalibur Technologies, marketed both
*RetrievalWare* and *Screening Room* to National Geographic and to NGTL.  In 2000, Excalibur

Technologies teamed with Loudeye Technologies, a services company, to bid for the contract ultimately awarded to DSMCi.  Ex. 15 at 21, 26 (Back TR).

63.     In late 2000, Excalibur Technologies met with NGTL to discuss the formation of Convera.  In March 2001, Ciaran Doyle, the Senior Vice President for Convera's ISG, attended another meeting with NGTL to discuss Convera's capabilities.  Ex. 18 at 77-80, 84 (Doyle TR).

64.     In April 2001 at the NAB Conference in Las Vegas, John Back, Convera's Vice President for North American Sales, met with NGTL's representatives, including Matt White and Dean Watts, to discuss future requirements for NGTL's media archiving project. After this session, NGTL invited Convera to send its engineers to talk to NGTL.  Ex. 15 at 96 (Back TR).

### May 10th Meeting: NGTL-Convera-DSMCi

65.     On May 10, 2001, Rose and Archibald met at the NGTL offices with representatives from NGTL and DSMCi.   Dean Watts and Gary Carter, both from NGTL, were at the meeting.  Duane Shugars and Gary Clarke represented DSMCi.  Ex. 5 at 43-44 (Rose TR).

66.     The meeting started with a session in a conference room at NGTL. Shugars explained the DSMCi system for the Convera engineers.  Ex. 5 at 45-46 (Rose TR).

67.     Shugars suggested that Carter demonstrate the NGTL Website.  Carter took Rose and Archibald to his nearby office to demonstrate the NGTL Website on his office computer.   Shugars did not initially go to Carter's office, but later joined Carter, Rose and Archibald there.  Ex. 5 at 137-138 (Carter TR); Ex. 5 at 45-46 (Rose TR).

68.     During the meeting, Rose asked for a copy of the NGTL Database schema, and was told by Shugars that he could get the database schema from NGTL's database backup tapes.   Ex. 5 at 47 (Rose TR); Ex. 10 at 25-27 (Archibald TR).

69.     At the same meeting, Rose asked how Convera could get access to the NGTL Website.   Shugars told Rose that he would have to go to NGTL for assignment of a username and password. Ex. 5 at 48-49 (Rose TR).

70.     Shugars does not recall the specifics of any conversation at the May 10th meeting.   Ex. 25 at 297, 302-303 (Sept. 2004 DSMCi 30(b)(6) TR)

71.     In a May 11 email reporting on the meeting, Archibald informed the other Convera engineers that Convera would have a copy in Oracle database schema for the NGTL Database to assess how to best migrate the NGTL data to a *Screening Room* database.  Ex. 10 at 27 (Archibald TR); Ex. 11.

72.     On May 11, NGTL assigned Convera a username/password combination for the NGTL Website.   Ex. 56 at 79-80, 94-95 (Carter TR).

73.     Gary Carter notified Jim Rose by email on May 11 that he had registered Convera as a NGTL Website user and had assigned Convera a username and a password combination.  Carter assigned Convera the username 'Wart'.   Ex. 56 at 94-95 (Carter TR) and Ex. 57; Ex. 5 at 41 (Rose TR).

### Convera/DSMCi Mutual Nondisclosure Agreement

74.     At the May 10th meeting Convera's Dave Teti suggested that Convera and DSMCi sign a mutual nondisclosure agreement.  Gary Clarke, DSMCi's Vice President, discussed the nondisclosure agreement with Duane Shugars in an October 2001 email exchange. Ex. 34.

75.     Convera and DSMCi signed a nondisclosure agreement on May 14, 2001. Ex. 3 ; Ex. 25 at 292-293 (Sept. 2004 DSMCi 30(b)(6).

## VI.     Convera's Phase 1 Work for NGTL

76.     In Phase 1, which spanned from July 2001 through February 2002, Convera worked on four tasks:  (a) preparing the *Screening Room/NGTL* database, (b) migrating the NGTL Database to the newly-prepared *Screening Room/NGTL* database, (c) developing the website user interface and the associated custom code, and (d) modifying *Screening Room* code to meet NGTL's requirements.  Ex. 13 at 331-32 (Henderson TR); Ex. 7 at 22-24 (Chen TR).

### Preparing the *Screening Room/NGTL* database

77.     Convera prepared the *Screening Room/NGTL* database to hold the data and keyframes from the NGTL Database.   Convera's development of the *Screening Room/NGTL* Database schema proceeded through multiple iterations. Ex. 8, ¶ 9  (Chen Decl.).   In discovery, Convera produced sixteen iterations of the *Screening Room/NGTL* schema covering the starting point through Convera's completion of Phase 1.   Ex. 22 ¶ 2 (Kurz Aff.).

### Database Migration

78.     The NGTL Database contained about 30 million data elements, consisting of approximately 2,000 hours of digitized film footage, keyframes (i.e., still shots taken from the digitized video), and associated metadata.  Writing the program or scripts necessary to extract these elements from the NGTL Database for migration into *Screening Room* required detailed knowledge of the schema of both the existing NGTL Database and the target *Screening Room/NGTL* database. Ex. 5 at 99, 104 and Aff. Ex. 4 (Rose TR); Ex. 7 at 41-51 (Chen TR); Ex. 8 ¶ 14 (Chen Decl.).

79.     Shortly after the May 10th meeting, NGTL sent Convera a backup copy of the NGTL Database on DLT tape.  Convera, however, could not read the DLT tape nor could Convera read a second DLT tape sent by NGTL in June.  Ex. 13 at 86 (Henderson TR).

80.     In mid-July 2001, when Shaun Henderson, the Convera project manager, visited NGTL's offices, Bernie Callahan had the NGTL Database backup file copied to Henderson's laptop computer.   Watts sent Convera the "icepick" password to open the NGTL Database.  Ex. 13 at 111, 125 (Henderson TR); Ex. 59 at 209-210 (Watts TR) and Ex. 60.

81.     Henderson arranged for an engineer with Oracle experience to restore the NGTL Database from the backup file, open the database, and prepare a diagram of the database schema.   Henderson provided the schema diagram to Stephen Chen and Brian Archibald, the Convera engineers working on the database migration. Ex. 13 at 138-139 (Henderson TR).

82.     For the successful migration from the NGTL Database to the *Screening Room/NGTL* database, Convera needed to understand the schema for the metadata database within the NGTL Database.   Ex. 5 at 99, 104 (Rose TR); Ex. 7 at 47, 51 (Chen TR).

83.     In mid-July, NGTL provided Convera with a copy of the backup file for the NGTL Database.  Convera restored the backup file, opened the database, and determined the NGTL Database schema using standard Oracle functions.  Ex. 13 at 138-139 (Henderson TR).

84.     NGTL advised DSMCi that it wanted the entire NGTL Database (meaning the video files, keyframe files and the metadata database) copied and delivered to Convera.  Ex. 24 (RFA2[1] No. 27).  On August 6-8, 2001, DSMCi monitored copying to a Network Appliance storage device of the entire NGTL Database at the DSMCi hosting site.  A technician from

---

[1] "RFA2" refers to DSMCi's responses to Convera's Second Requests for Admission.  DSMCi admits the authenticity of this document in response to Request No. 27.  The Second Requests for Admission are attached as Ex. 24.

Network Appliance delivered the device to a waiting Convera engineer, who shipped the device to Convera's Oregon facility where it arrived in Oregon the following day.   Ex. 47 at 169-71 (Lam TR); Ex. 13 at 341, 352 (Henderson TR).

85.    To accomplish the data migration from the NGTL Database to the *Screening Room/NGTL* database, Stephen Chen and Brian Archibald wrote scripts or programs that picked the nearly 30 million individual data elements out of the NGTL Database and then inserted the data into the *Screening Room/NGTL* database.   Ex. 7 at 66 (Chen TR).

86.    The data migration scripts, which Convera named DataMover, progressed through multiple steps.   Convera produced in discovery electronic copies of the multiple version of the DataMover scripts.   Ex. 8 ¶ 14 (Chen Decl.); Ex. 22, ¶ 3 (Kurz Aff.).

87.    The NGTL Database included approximately 2.5 million keyframes. Keyframes are still shots taken at a specific point in a video clip that allow a preliminary review of the video without having to play the video; a display of keyframes provides the user with an understanding of the video content.   Ex. 7 at 70-72 (Chen TR).

88.    To insert the keyframes in the *Screening Room/NGTL* database, Convera needed the time codes that connected the individual keyframes to the video and to the metadata. Convera had no directions or documentation from DSMCi that explained where to find the time codes.   Ex. 7 at 76 (Chen TR).

89.    Convera engineers could see, on the NGTL Website, that some problem keyframes appeared in a consistent order, which meant that DSMCi somewhere had the time codes.   Charlie Pow, Convera's senior engineer within ISG, proposed in an August 9, 2001 email that Convera reverse-engineer the display of the frame images.   Ex. 16 at 113, 159-160 (Pow TR) and Ex. 17; Ex. 12.

90.    In the keyframe portion of the NGTL Database, Convera located map.txt files that contained time codes for approximately 10-15% of the keyframes.   Stephen Chen wrote a FrameMover script to migrate these keyframes.  Convera, however, never found time codes for the remaining 85-90% of the keyframes, and could not migrate those keyframes.  Convera produced the FrameMover scripts in discovery.  Ex. 7 at 74-78, 80-81 (Chen TR); Ex. 22, ¶ 3 (Kurz Aff.).

91.    DSMCi experienced problems with missing keyframes in the months preceding the database transfer.  DSMCi reported the 'Missing Keyframe' problems in its Weekly Status Reports for March 30, 2001 and June 29, 2001.  Ex. 24 at and 39 and Ex. 40 (RFA2 Nos. 30 and 37); Ex. 25 at 216-220 (July 2004 DSMCi 30(b)(6) TR) .

92.    The missing keyframes problem remained an 'OPEN' issue in DSMCi's August 17, 2001 Weekly Status Report.  [Ex. 41 at 3 (RFA2 No. 49).  DSMCi reported the missing keyframe problem corrected in its August 30, 2001 Weekly Status Report.  Ex. 42 at 2-3.

93.    The NGTL Database delivered to Convera had 'dirty data' problems. Stephen Chen reported that the database was missing data, had many 'null' data fields, and included many clips with 'negative durations.'  These problems slowed Convera' migration of the NGTL Database to the *Screening Room/NGTL* database.  Ex. 7 at 96-103 (Chen TR); Ex. 8 ¶ 20 (Chen Decl.).

94.    Convera engineers sometimes referred to the data and keyframe migration process as "re-engineering the database."  Ex. 13 at 384 (Henderson TR).

95.    Convera used its knowledge of the NGTL Database schema solely to migrate the data and keyframes from the NGTL Database to the *Screening Room/NGTL* database. Ex. 13 at 385-386 (Henderson TR); Ex. 10 at 162 (Archibald TR).

**Custom User Interface Software and Software Modifications for NGTL Project**

96.     NGTL directed that Convera's user interface continue the look and feel of the current NGTL Website.   Ex. 52 at 183 (Grossman TR).

97.     Starting with screen shots and other information provided by NGTL, Chris Rich and his design team established the user interface requirements consistent with NGTL's directions.  Shaun Henderson prepared the Requirements Documents based on Rich's specifications.    Stephen Chen's engineering team then wrote the code consistent with the stated requirements.  Ex. 8  ¶ 23 (Chen Decl.); Ex. 7 at 82-84, 114, 127 (Chen TR); Ex. 9 ¶ 16-17 (Rich Aff.).

98.     The webpages for the NGTL Website had their own look and feel. DSMCi's standard webpages were purple and yellow, with a different look and feel.  Ex. 48 at 180 (Norwood TR).

99.     In April 2002 DSMCi requested in discovery access to the Convera-hosted NGTL website.  NGTL, at Convera's request, assigned DSMCi a username and password to the website.  The username remained valid at least through the period while Convera hosted the website. Ex. 22,  ¶ 5 (Kurz Aff.).

100.    In late August 2001, Chen learned that one of his engineers had used some client-side code from the NGTL Website LOGIN page in Convera's development of a portion of its webpages for NGTL.  The LOGIN page client-side code included code for the font, the colors, a general page layout, and some JavaScript.  Chen identified the pages in development that possibly included LOGIN page code, and ordered destruction of those webpages.  Ex. 7 at 85-93, 197-198, 231-236, 260 (Chen TR).

101.    A second Convera engineer developed the replacement webpages from scratch before the website was published, which required approximately one day's effort. Convera completed this work well before it assumed hosting responsibility for the NGTL Website on September 15, 2001.   Ex. 7 at 90-93, 135-36, 197-198, 260 (Chen TR).

102.    DSMCi claims that Convera copied code from the LOGIN page.   Ex. 25 at 323-24, 332-33 (Sept 2004 DSMCi 30(b)(6) TR).   NGTL Website LOGIN page did not mention DSMCi.  No DSMCi copyright information appears on the LOGIN page.  The LOGIN page, however, had the NGTL logo and a notice "(c) 2000 National Geographic Television Library, Inc."  Ex. 9 ¶ 7 (Rich Aff.); Ex. 7 at 262 (Chen TR); Ex. 8 at Decl. Ex. 2 (Chen Decl.).

103.    The client-side code for the NGTL Website LOGIN Page (from the login.html file in ngt_Gold) includes the code for the "(c) 2000 National Geographic Television Library, Inc." line; this client-side code does not include DSMCi copyright information.   Ex. 23.

104.    Convera modified some of the *SR/Browse* and *RetrievalWare* software to meet NGTL's requirements. Ex. 8 ¶ 22 (Chen Decl.). Convera produced in discovery the *SR/Browse* source code and the modified code.   Ex. 22, ¶ 4 (Kurz Aff.).

## VII.    Convera Access to the NGTL Website
### MAS Logs and Netscape Web Logs

105.    As a contract requirement, DSMCi maintained an electronic log, the MAS Logs, that recorded every action on the NGTL Website. Ex. 39 at 4.   DSMCi also maintained a set of Web Logs produced by the Netscape web server that recorded all web server activity. Between the two logs, DSMCi recorded all NGTL Website activity, including each Convera access and inquiry.   Ex. 46 at 66 (Anglin TR); Ex. 47 at 22, 152-58 (Lam TR); Ex. 35 at 41 (Dlugokinski TR).

**NGTL's Registration of 'Wart' as Username for Convera**

106.    Gary Carter's May 11, 2001 registration of Wart appears in the MAS Logs.   The registration entries identify Convera as the user, and show that Wart had read-only privileges.  Ex. 56 at 90-93, 115-116, 141-142 (Carter TR); Ex. 43 (RFA2 No. 60)

107.    When Gary Carter re-registered Wart as a valid username for Convera on May 22, 2001, the MAS Logs recorded those entries as well.  Ex. 44 (RFA2 No. 61); Ex. 56 at 115-118 (Carter TR).

108.    The Wart username/password combination was distributed to the Convera engineers working on the NGTL project who accessed the NGTL Website from May 14, 2001 until August 16, 2001.  Ex. 6 at 41 (Rose TR); Ex. 7 at 25 (Chen TR).

109.    NGTL, not DSMCi, had control over the registration  of its website users, and during the time DSMCi hosted the NGTL Website.   Ex. 52 at 165-66 (Grossman TR) and Ex. 53; Ex. 56 at 94-95 (Carter TR); Ex. 61 at 289 (White TR); Ex. 25 at 91-96, 128-129 (Mar. 2002 DSMCi 30(b)(6) TR).

110.    The NGTL Database stored usernames and passwords in the User Database, part of the NGTL Database.  Ex. 47 at 37 (Lam TR).

111.    DSMCi tracked Convera's activity using the username/password combination, beginning on May 22, 2001.   About the tracking, DSMCi's CEO instructed "Keep the Convera thing in our pocket for now . . ."  Ex. 26 (RFA2 No. 42); Ex. 25 at 125-129, 131-134 (June 2004 DSMCi 30(b)(6) TR).

112.    While DSMCi hosted the NGTL Website, NGTL registered several hundred users from around the world.  Ex. 55.

113.    On August 15, 2001, NGTL did not extend the DSMCi hosting contract past September 15, which meant that Convera would assume hosting the website on that date.

114.    On August 15, 2002, after learning of NGTL's decision not to extend its hosting contract for a third month, DSMCi deleted Wart as a registered user.  Ex. 45 (RFA2 No. 64); Ex. 25 at 314 (September 2004 DSMCi 30(b)(6) TR).

**Convera NGTL Website Access, August 16-20**

115.    Chen only used only the Wart username/password combination to access the NGTL website until August 16, 2001, when the Wart combination failed.  Chen then selected "MRice" from the user portion of the database to use as an interim username/password combination until NGTL could reinstate Wart.  He used MRice until August 21.  Like Wart, MRice was registered as a basic user of the website.  Ex. 7 at 136-137, 144-146 (Chen TR); Ex. 8 ¶ 29 (Chen Decl.).

116.    DSCMi claims that Convera's use of the username/passwords Wart, MRice, and "AIQC" were illegal circumvention.  Ex. 25 at 319-321 (Sept 2004 DSMCi 30(b)(6) TR).  Stephen Chen selected MRice from the user database included within the NGTL Database.  Ex. 8 ¶ 29 (Chen Decl.).   MRice and AIQC were valid username/password combinations from the NGTL Database.  Ex. 25 at 320-321 (Sept 2004 DSMCi 30(b)(6) TR).

117.    DSMCi claims there was an additional August 16 login from Convera's San Jose IP address that DSMCi associates with the username 'AIQC'.  DSMCi concluded that in the single login the user was looking for the keyframe links.  Ex. 25 at 35 (Sept. 2004 DSMCi 30(b)(6) TR)

118.    Unlike MRice and Wart, AIQC was registered as an administrative user of the website.  Even administrative users had no access to source or server-side code.  Ex. 25 at 319-322 (Sept. 2004 DSMCi 30(b)(6) TR); Ex. 47 at 127 (Lam TR).

119.    Stephen Chen reported the problem with Wart to his program manager.  A Friday message from the manager to NGTL for directions brought no immediate response.   Ex. 7 at 135-136 (Chen TR); Ex. 8, ¶ 30 (Chen Decl.).

120.    Convera continued its database migration and hosting preparation work and confirmed work with NGTL employees who could directly access the website.  Ex. 59 at 25-30 (Watts TR).

121.    When Shaun Henderson connected with Dean Watts on August 21,  Watts told Henderson that NGTL and DSMCi were involved in a dispute and that Convera should stop its access to the NGTL Website.   Ex. 13 at 262-263 (Henderson TR); Ex. 59 at 28 (Watts TR).

122.    This August 21 call was the first time Henderson and Watts talked about Convera's access to the NGTL website.   Ex. 13 at 262 (Henderson TR)

123.    After getting Watts' direction, Henderson  instructed his project team to stop all access to the NGTL website.  Convera stopped.  Ex. 13 at  266-268 (Henderson TR); Ex. 7 at 28 (Chen TR).