**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                              )
DSMC, INCORPORATED,           )
                              )
              Plaintiff,      )
                              )
      v.                      )      Civil Action No. 01-2284 (EGS)
                              )
CONVERA CORPORATION,          )
                              )
              Defendant.      )
_____)
```

<u>**MEMORANDUM OPINION**</u>

This cases arises from a dispute between two companies involved in the migration of National Geographic film footage onto a searchable Internet website.  Pending before the Court is defendant's motion for summary judgment.  Upon consideration of the motion, responses and replies thereto, oral argument during the motions hearing, applicable law, and the entire record, the Court **grants in part and denies in part** defendant's motion.

**I.    BACKGROUND**[1]

NGT Library, Inc. ("NGTL") is a wholly owned subsidiary of National Geographic Television, Inc.  NGTL manages, preserves, and distributes film footage produced by National Geographic Television and used on the National Geographic Channel.  NGTL

---

[1] Unless otherwise indicated, all facts and alleged factual disputes noted in this section draw from the parties' Combined Statement of Material Facts ("Combined Facts"), which includes Convera's Statement of Facts Not Genuinely Disputed ("Def.'s Facts"), DSMCi's Statement of Facts Genuinely in Issue ("Pl.'s Facts"), and Convera's Reply ("Def.'s Reply Facts").  *See* Ex. B to Convera's Brief in Response to Sur-Reply of DSMCi.

developed a plan for moving the films produced for National

Geographic Television into a searchable Internet website, which

led to the controversy in this case.  NGTL adopted a three-phase

plan: (1) prepare a database of digitized footage and associated

metadata and temporarily host it on the Internet; (2) select and

implement permanent video management software; and (3) move the

Internet website in-house.

### A.   DSMCi's Product

Plaintiff DSMC, Inc. ("DSMCi") developed its first Media

Archive System[2] ("MAS") in late 1998 while working on contracts

with Computer Science Corporation and South Carolina Educational

Television.  DSMCi released three versions of is MAS Version 1

software.  While the basic architecture of the MAS system

remained constant in each version, DSMCi customized the product

for each client. The third version, MAS Version 1.3, was for

NGTL.[3]  In customizing DMAS for NGTL, DSMCi used and integrated

---

[2] "Media archiving systems, also known as media asset
management systems, are complex content management systems that
enable users to manage terabytes of video."  Expert Report of W.
David Elliott ("Elliot Rpt.") at 2, Ex. 1 to DSMCi's Opp'n to
Def.'s Mot. for Summ. J. (Pl.'s Opp'n").

[3] The media archive system that DSMCi customized for NGTL is
referred to as "DMAS" throughout this opinion.  In the
Integration Services Agreement signed by DSMCi and NGTL, "DMAS"
refers to the entire NGTL database created pursuant to the ISA.
*See* ISA ¶ 3(b), Ex. 1 to Def.'s Mot. for Summ. J.  DMAS includes
both "Integrator Software" and "Third Party Software."  *Id.*
Integrator Software is the "object code versions of the software
programs developed by or for [DSMC]."  *Id.* ¶ 3(e)(i).  Third
Party Software refers to other third party software programs

several third-party products including Oracle and Netscape products and Virage VideoLogger.  DMAS consists of a series of HTML and JavaScripts that link the searchable NGTL Database to the Netscape web server, allowing users to access the website from the Internet, search through the database, and view selected video clips.  DSMCi claims that its product contains capabilities not found in any other media archive system, including Convera's Screening Room.

Defendant Convera Corporation ("Convera") claims that DSMCi's MAS Version 1 closely resembles a product described in a 1997 Virage publication and a 1997 Oracle software guide. Convera also claims that the methods required to implement a web-based, interactive, video-clip-asset indexing, search, and management system with a graphic user interface were published in thirteen patents prior to November 15, 2000.  DSMCi disagrees with these characterizations to the extent it suggests that the trade secrets DSMCi claims exist in DMAS were present in these publications.[4]

---

necessary to create DMAS, such as Virage VideoLogger, Verity brand search and retrieval software, and Oracle 8i.  *Id*. ¶ 3(e)(ii).

[4] At times, DSMCi also demonstrated its software at National Association of Broadcasters ("NAB") conferences and prepared demonstration websites to show its product on the Internet. DSMCi claims that these demonstrations did not reveal any trade secrets to the public.

### B.    Convera's Product

Convera developed a video database management product similar to MAS Version 1.  Convera's product, Screening Room, is a video cataloging, previewing and retrieval system that manages significant video libraries.  Convera began development on Screening Room in 1997 and released the first version of the product in July 1998.  As of December 2000, Screening Room included capture, edit, browse, analysis and search capabilities. By 2001, Convera had invested over $30 million in Screening Room and over $30 million in RetrievalWare, which provides the search capability in Screening Room.

Convera used Screening Room for a project with NASA to manage video from space shuttle flights and from the international space station.  According to Convera, the Screening Room product customized for NASA allowed NASA to download, digitize and store online video feeds.  The entire video library could also be searched and selected clips replayed.  Convera claims that the Screening Room/NASA deployment in late 2000 was Convera's first implementation of a clip level search capability.

### C.    NGTL's Contract with DSMCi

In November 2000, NGTL signed an Integration Services Agreement ("ISA") with DSMCi, with an effective date of September 13, 2000.  *See* ISA, Ex. 1 to Def.'s Mot. for Summ. J.  Convera was not a party to the ISA and Convera claims that NGTL did not

4

provide Convera a copy of the ISA.  Convera further claims that it did not see a copy until this litigation commenced.

Under the ISA, DSMCi was to digitize approximately 2000 hours of NGTL video footage, create a searchable database of the metadata associated with the footage, together with descriptions of video clips, and host the NGTL Database on the Internet from December 6 2000 until July 9, 2001, unless the hosting term was extended by NGTL.[5]  In consultation with NGTL, DSMCi also developed the "structure, graphic design elements, and functionality requirements for the user interface."  ISA, Ex. A: Integration Services ¶ 1.  The ISA also provided that DSMCi was to deliver to NGTL the "final NGTL Database backup" and also deliver to NGTL each month a back-up copy of the database.  Def.'s Facts ¶ 12.

The ISA also provides that DSMCi granted a license for DSMCi's software to NGTL during the term of the contract.  *See* ISA ¶ 16(c)(i).  Under this licensing agreement, NGTL agreed that it would not authorize any third party to "modify, reproduce, reverse engineer, decompile, cross-compile, disassemble, translate or decode, or otherwise attempt to discover the source code of or any processes or algorithms embodied in" DSMCi's software.  *Id.*

---

[5] DSMC and NGTL agreed to two extensions of the hosting term, first to August 15, 2001, then to September 15, 2001. Def.'s Facts ¶ 14.

### D.    Convera Acquires NGTL Database Migration Project

In Spring 2001, Convera had several meetings with NGTL regarding Convera's video database management capabilities.  In April 2001, Convera and NGTL representatives met at a conference and discussed the future requirements of NGTL's media archiving project.  NGTL invited Convera to send its engineers to NGTL.

On May 10, 2001, Convera engineers Jim Rose and Brian Archibald met at the NGTL offices with representatives from NGTL and DSMCi.  DSMCi CEO Duane Shugars attended at least part of this meeting.  Shugars explained the DSMCi system to the Convera engineers.  NGTL representative Gary Carter then demonstrated the NGTL website for Rose and Archibald.  At the meeting, a Convera representative suggested that Convera and DSMCi sign a nondisclosure agreement.  Such an agreement was signed by both companies on May 14, 2001.

The parties dispute a number of the facts surrounding the May 10, 2001 meeting.  Convera states that Convera engineer Jim Rose asked Carter of NGTL if Convera could get the NGTL Database schema[6] and was told by Shugars that he could get the database

---

[6] The term "database schema" or "schema" "refers to the organization of data within a database."  Chen Decl. ¶ 7, Ex. 8 to Def.'s Mot. for Summ. J.  The schema "may be represented as a diagram that shows the various tables in a database, and within each table identifies the fields and their definitions."  *Id*. The "complete schema, however, is typically an electronic file that includes details of all the tables, fields and relationships in the database."  *Id*.

schema from NGTL's database backup tapes.  However, during his deposition, Shugars indicated that he could not recall whether or not Rose asked to see the schema.  Shugars stated that the discussion he would have had with Rose would have been specific to accessing the data, not the entire schema, so that Convera could import the data into its own schema.  At the same meeting, Rose asked how Convera could get access to the NGTL website.  According to Rose, Shugars told Rose that he would have to go to NGTL for assignment of a username and password.  Plaintiff disputes this fact, stating that DSMCi gave no such instructions and would not have given such instructions.  Shugars' deposition provides no clarity on this point.  *See* Shugars Dep. at 303 (discussing access to website on May 10 but not discussing any other access to website).

On May 11, 2001, NGTL assigned Convera a username/password combination for the NGTL website.  NGTL assigned Convera the "Wart" username.

That same day, Convera engineer Archibald informed other Convera engineers via email that Convera would have a copy of the "customized Oracle schema" then being used by NGTL so that Convera could "analyze what is necessary to 'massage' it and/or our SR schema to make SR work with the current NGS data."  Email from Brian Archibald to Convera engineers (May 11, 2001), Ex. 11 to Def.'s Mot. for Summ. J.  Around the same time, NGTL sent

7

Convera a backup copy of the NGTL database on DLT tape.  Convera could not read this backup tape nor could it read a second tape sent by NGTL in June.

In mid-July, Convera project manager Shaun Henderson had NGTL load a copy of the NGTL backup for the database onto his laptop and then realized that the database was password protected.  He then sent an email to Dean Watts and Gary Carter at NGTL to obtain a password so that Convera could look at the database schema.  *See* Email from Shaun Henderson to Dean Watts and Gary Carter (July 17, 2001) ("I'm excited to report that we have got the DSMCi Oracle DB restored, but have found that it is password protected.  Can we obtain the password to that DB, so that we can take a look at that schema?").  Two days later, Henderson obtained the "icepick" password from NGTL, allowing Convera access to the database on the backup tape and, as a result, DSMCi's database schema.

### E.   NGTL/Convera Contract

On July 20, 2001, DSMCi and NGTL signed a Master Services Agreement ("MSA").  The contract required Convera to migrate and integrate the NGTL Database into Convera's Screening Room software, add NGTL-requested functionality to operate Screening Room, and temporarily host the Screening Room/NGTL website.  In the MSA, NGTL represented to Convera that "all Digital Content, Metadata, and other material provided to Convera by NGTL or on

its behalf may be reproduced and otherwise utilized as necessary by Convera" in its work for NGTL.  MSA ¶ 6(a), Ex. 2 to Def.'s Mot. for Sum. J.  NGTL tasked Convera with acquiring NGTL's data from the existing NGTL Database and transferring it to the Screening Room database.  From July 2001 to July 2003, Convera hosted the Screening Room/NGTL website.  In July 2003, NGTL transferred the website to its own in-house facilities.

### F.   Convera's Migration of the NGTL Database to Screening Room

Convera claims that it used its Screening Room/NASA product as a base for creating the Screening Room/NGTL Database.  Convera also claims that its engineers used the database schema from the NASA project as the base for Screening Room/NGTL.[7]  Plaintiffs dispute this fact to the extent it suggests that Screening Room/NGTL does not include material copied from the DMAS schema. DSMCi points to emails and other documentary evidence that DSMCi claims shows that Convera freely admitted reverse engineering DSMCi's schema.  *See*, *e.g.*, High-Level Delay Analysis, Ex. 43 to Pl.'s Opp'n (indicating an understanding of the "database schema," describing the "[r]eengineering effort," and explaining the need to "reverse engineer the display of the frame images"

---

[7] Convera's development of the Screening Room/NGTL schema proceeded through multiple iterations and Convera produced all sixteen iterations of this schema to DSMCi in discovery.

and "compare how the DSMCi system displays the images to reverse engineer the logic").

NGTL claims that it needed to have a detailed knowledge of the existing NGTL Database and the target Screening Room/NGTL database in order to successfully migrate the data.  DSMCi disputes that Convera needed detailed knowledge of the schema developed by DSMCi in order to complete the migration.  Instead, DSMCi argues that Convera could have developed an independent media archiving system without access to the backup tape or DMAS but DSMCi claims that the cost of doing so would have been more than NGTL was willing to pay and could not have been accomplished within the timeline set by NGTL.

The NGTL Database consisted of approximately 30 million data elements, or approximately 2000 hours of video footage, keyframes (still shots taken from digitized video), and associated metadata.  To migrate the database, Convera claims that it wrote program scripts that picked the individual data elements out of the NGTL Database and inserted them into the Screening Room/NGTL database.  The DataMover scripts were produced to DSMCi in discovery.

Convera officially started its database conversion work in July 2001 and completed the project nine weeks later.  To complete the project, Convera utilized the backup NGTL Database and "icepick" password provided by NGTL, and the full NGTL

Database, which included video files and keyframes and was delivered to Convera by DSMCi on a Network Appliance storage device.  Convera also used usernames and passwords supplied by NGTL to get basic user access to the NGTL website.  NGTL, not DSMCi, had control over the registration of its website users. NGTL was one of only a few hundred registered basic users who had access to the NGTL website while it was being hosted by DSMCi.

Throughout the entire period that Convera had access to the DSMCi-hosted NGTL website, registered basic users could not access the software code on DSMCi's internal network.  DSMCi maintained a firewall between the Internet and its internal network.  Internet users also could not access DSMCi's MediaArchive.web file that resided outside DSMCi's firewall. Basic users had read-only access, meaning they could see pages, and perform limited functions such as basic searches, advanced searches, search results, and shopping cart.  Neither a basic user nor an administrative user had any access to the website's source code.  The HTML and client-side JavaScripts used by DSMCi to create webpages ("client-side code") was available to any basic user by right clicking on the webpage and then hitting "View Source."

Convera engineers used the "Wart" username to gain access to the NGTL Database from May 14 to August 16, 2001.  The record suggests that, at least in May, DSMCi was aware that Convera had

access to the NGTL Database.  DSMCi had logs that recorded every
action on the website, including the log-ons with the Wart
username.  On August 15, 2001, after learning that NGTL would not
continue its hosting contract, DSMCi deleted Wart as a registered
user.  When Convera's engineer (Stephen Chen) found out that the
Wart username did not work, he selected another username "MRice"[8]
from the user portion of the database to gain access to the
website.  DSMCi claims that it was not proper for Convera to use
the MRice username to gain access to the NGTL Database.  Both the
Wart and MRice usernames gave Convera only basic user access.
DSMCi claims that Convera also accessed the website on at least
one occasion using the "AIQC" username.  This username gave
administrator access.

On August 21, 2001, Convera was told by NGTL that DSMCi and
NGTL were involved in a dispute and Convera should stop all
access to the NGTL website.  Convera claims that it did so.
However, even after Convera lost access to the website, DSMCi
claims that Convera employees continued to receive critical
information about DMAS's functionality by having an NGTL employee
ask questions of DSMCi and then report back to Convera.  *See*
Email from Shaun Henderson to Stephen Chen (Aug. 22, 2001), Ex.
45 to Pl.'s Opp'n.

---

[8] During oral argument, DSMCi's counsel indicated the MRice
was the username of an NGTL employee.

Convera and DSMCi disagree on whether the August 21 conversation was the first time that Convera was aware that it should not access the NGTL website.  On May 31, 2001, Convera representative David Teti spoke with DSMCi representative Gary Clarke.  Clarke informed Teti that "DSMCi . . . had detected an intruder, with a username starting with W, who was illegally accessing specific functionality in the DSMCi proprietary product developed for Nat Geo and that this was being tracked by an FBI agent."  Email from David Teti to Brian Archibald (May 31, 2001), Ex. 32 to Pl.'s Opp'n.  On June 13, 2001, NGTL reaffirmed to DSMCi that NGTL would prevent access to DMAS by representatives and agents of competitors like Convera.  *See* Letter from Gary Clarke, DSMCi Vice President, to NGTL representatives Chris Liedel and Bernard Callahan (June 13, 2001), Ex. 34 to Pl.'s Opp'n (recapping "[e]xplicit understanding that DSMCi is open and willing to provide specific and for a fee, professional services to and for Convera or other vendors selected by NGTL, but access to the DMAS by representatives and agents of direct competitors to DSMCi shall be prohibited").  There is some confusion in the deposition testimony of Dean Watts, NGTL's principal contact with Convera, about whether Watts told Convera to discontinue access in June 2001 or if he did not tell Convera until August 2001.

### G.    Allegations of Direct Copying of Client-Side Code

In late August 2001, Convera engineer Stephen Chen discovered that one of his engineers had used some client-side code from the NGTL website LOGIN page when developing webpages for the NGTL/Screening Room project.  The client-side code included some code for font, colors, general layout and some JavaScript.  Chen identified those webpages that possibly included code from the LOGIN page and ordered destruction of those pages.  He then assigned a second Convera engineer to re-create the pages from scratch.  DSMCi disputes these facts to the extent that Convera suggests that it is certain that it removed all the infringing code, only relying on the deposition testimony of Chen.  Convera notes that no DSMCi copyright information appears on the LOGIN page.  Instead, only NGTL copyright information appears there.

## II.  DISCUSSION

### A. Standard of Review

This Case is before the Court on defendant's motion for summary judgment.  Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. Dist. of*

*Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B.    Misappropriation of Trade Secrets**

DSMCi claims that Convera misappropriated DSMCi's trade secrets in violation of the District of Columbia Uniform Trade Secrets Act ("DCUTSA"), D.C. Code § 36-401, *et seq.*[9]  To establish a trade secret misappropriation claim, DSMCi must demonstrate (1) the existence of a trade secret; and (2) acquisition of the trade secret by improper means, or improper use or disclosure by one under a duty not to disclose.  *See* D.C. Code § 36-401; *Catalyst*, 350 F. Supp. 2d at 7-8; *Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 403 (5th Cir. 2000).

---

[9] The DCUTSA is based on the Uniform Trade Secrets Act ("UTSA"), as are the trade secret statutes of a number of states. *Catalyst & Chem. Serv., Inc. v. Global Ground Support*, 350 F. Supp. 2d 1, 8 n.3 (D.D.C. 2004).  Moreover, the DCUTSA is intended to "make uniform the law with respect to trade secrets" among the District of Columbia and other states adopting the UTSA.  D.C. Code § 36-408.  Accordingly, when interpreting the DCUTSA, it is appropriate for this Court to consider how courts in other jurisdictions have interpreted different states' trade secret acts.  *Catalyst*, 350 F. Supp. 2d at 8 n.3 (citing cases).

1.   **Trade Secret**

The "threshold inquiry" in every trade secret case is "whether or not there [is] a trade secret to be misappropriated." *Catalyst*, 350 F. Supp. 2d at 8 (quoting *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 147 F. Supp. 2d 1057, 1065 (D. Kan. 2001)) (internal quotation marks and citations omitted). For information to constitute a trade secret under the DCUTSA, (1) the "information must be secret"; (2) "its value must derive from its secrecy"; and (3) its owner must use reasonable efforts to safeguard its secrecy.  *Catalyst*, 350 F. Supp. 2d at 8 (quoting *Motor City Bagels, LLC v. Am. Bagel Co.*, 50 F. Supp. 2d 460, 478 (D. Md. 1999)) (internal quotations omitted).[10]

Whether a particular piece of information is a trade secret is generally a question of fact.  *Dreamcatcher Software Dev., LLC v. Pop Warner Little Scholars, Inc.*, 298 F. Supp. 2d 276, 282 (D. Conn. 2004).  Courts have held as a matter of law, however, that

_____

[10] The DCUTSA defines a trade secret as:

information, including a formula, pattern, compilation, program, device, method, technique, or process that:

(A) Derives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use; and

(B) Is the subject of reasonable efforts to maintain its secrecy.

D.C. Code § 36-401(4).

trade secret law does not protect information that is "easily ascertainable by the public," *Linkco, Inc. v. Fujitsu, Ltd.*, 230 F. Supp. 2d 492, 498-99 (S.D.N.Y. 2002), or "generally known within an industry." *Catalyst*, 350 F. Supp. 2d at 9.  Even if individual elements are known to the public, a trade secret can exist in a unique combination of those otherwise publicly available elements.  *Id.*; *see also Elm City Cheese Co. v. Federico*, 752 A.2d 1037, 1047 (Conn. 1999) (finding that "plaintiff's ability to combine these elements into a successful . . . process, like the creation of a recipe from common cooking ingredients is a trade secret entitled to protection") (internal quotation marks and citations omitted).

In order to survive summary judgment, a plaintiff claiming that its software contains trade secrets must come forward with evidence sufficiently identifying those portions of the software or combination of features within the software that are not generally known in the industry.  *See, e.g., IDX Systems Corp. v. Epic Systems*, 285 F.3d 581, 583-84 (7th Cir. 2002) ("[A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition [of a trade secret].");  *IMAX Corp. v. Cinema Tech., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998) ("The plaintiff 'should describe the subject matter of the trade secret with sufficient particularity to separate it

17

from matters of general knowledge in the trade or of special
knowledge of those persons . . . skilled in the trade.'")
(citation omitted).

Convera argues that it is entitled to summary judgment
because DSMCi has not identified with sufficient particularity
the portions of its software program that qualify for trade
secret protection, i.e., that were not generally known by those
skilled in the video database management industry.  DSMCi
counters that DMAS contains capabilities not found in any other
media archive system, including Convera's Screening Room.
Specifically, DSMCi has identified nine different features of
DMAS that it argues constitute protectable trade secrets.  Unlike
the plaintiff in *IDX Systems*, who just identified its entire
software product as a trade secret without pointing to specific
features that were trade secrets, 285 F.3d at 583-84, DSMCi has
sufficiently identified its alleged trade secrets.

The Court notes that a trade secret "is one of the most
elusive and difficult concepts in the law to define." *Carbo
Ceramics, Inc. v. Keefe*, 166 Fed. Appx. 714, 718 n.1 (5th Cir.
2006) (quoting *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569
F.2d 286, 288 (5th Cir. 1978)) (internal quotation marks
omitted).  The question of "whether certain information
constitutes a trade secret ordinarily is best 'resolved by a fact
finder after full presentation of evidence from each side.'" *Id.*

18

(quoting *Lear Siegler*, 569 F.2d at 289).  At a minimum, drawing all reasonable inferences in favor of DSMCi, there is a material dispute of fact as to whether the features identified by DSMCi constitute trade secrets.

### 2. Misappropriation

In addition to establishing that there is a trade secret, a plaintiff claiming misappropriation of trade secrets also must show that the defendant gained access to the trade secrets through improper means or that the defendant improperly used or disclosed trade secrets.  Under the DCUTSA, "misappropriation" is defined as:

(A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) Used improper means to acquire knowledge of the trade secret; or

(ii) At the time of disclosure or use, knew or had reason to know that the trade secret was:

(I) Derived from or through a person who had utilized improper means to acquire it;

(II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

(III) Derived from or through a person who owed a duty to the person seeking

> relief to maintain its secrecy or
> limit its use; or

(iii)  Before a material change in his or her
position, knew or had reason to know that
the information was a trade secret and
knowledge of the trade secret had been
acquired by accident or mistake.

D.C. Code § 36-401(2).

The DCUTSA defines "improper means" as "theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic or other means."  D.C. Code § 36-401(1).  Courts have held, however, that the statute does not provide an exhaustive list of what constitutes improper means.  *See, e.g., Reingold v. Swiftships, Inc.*, 126 F.3d 645, 648 (5th Cir. 1997) ("A complete catalogue of the means which are 'improper' for a person to acquire knowledge of the trade secret is not possible, but [the UTSA] includes a partial listing."); *Systems 4, Inc. v. Landis & Gyr, Inc.*, 8 Fed. Appx. 196, 200 (4th Cir. 2001) (finding that list of improper means in the UTSA is "not exhaustive" but that all of the examples listed "constitute intentional conduct involving some sort of stealth, deception, or trickery").  More generally, "improper means" has been defined as those means that "fall below the generally accepted standards of commercial morality and reasonable conduct."  *E.I. DuPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1016 (5th Cir. 1970) (citation omitted).

20

DSMCi alleges that Convera used stealth, deception and trickery to gain access to DSMCi's trade secrets.  Specifically, DSMCi alleges that Convera (1) gained "wrongful" access to "phony" usernames and passwords to access DMAS; (2) used its "improper access" to reverse engineer DMAS in violation of the ISA signed between NGTL and DSMCi; (3) directly copied DSMCi's backup tape; (4) conspired with NGTL to gather additional information by exploiting NGTL's business relationship with DSMCi; and (5) directly copied DSMCi's code for several user interface screens.  Pl.'s Opp'n at 30.  DSMCi further alleges that Convera breached or induced a breach of a duty to maintain secrecy because the ISA between NGTL and DSMCi provided for only one backup copy of DSMCi's software and provided that the backup tape was to remain the sole property of DSMCi.  The ISA also prohibited NGTL from authorizing anyone to "reproduce, reverse engineer, decompile, cross-compile, disassemble, translate or decode, or otherwise attempt to discover the source code of or any processes or algorithms embodied in the Integrator Software." *See* ISA ¶ 16(c)(i), Ex. 1 to Def.'s Mot. for Summ. J.

Convera counters that DSMCi cannot establish improper means because Convera accessed the NGTL website and database with passwords provided by NGTL.  Convera further argues that it openly requested access to the NGTL Database at a meeting with NGTL and DSMCi and that Convera and DSMCi executed a

nondisclosure agreement covering any confidential information to which Convera gained access during the database migration. Convera also contends that the DSMCi/NGTL ISA directly contemplates migration of the database.  Moreover, Convera argues that migration of the NGTL Database into Screening Room required taking approximately 30 million data elements out of the NGTL Database and inserting them into the Screening Room/NGTL database.  Convera claims that the NGTL/Convera MSA required NGTL to provide Convera with a copy of the NGTL Database and its schema.  Essentially, Convera argues that all access it has to the NGTL Database was with permission of NGTL and that such access is not misappropriation within the meaning of the DCUTSA. Convera also contends that DSMCi produced no evidence that Convera used or disclosed DSMCi's trade secrets in violation of the DCUTSA.

The Court finds that there are genuine issues of material fact as to whether Convera misappropriated DSMCi's alleged trade secrets.  To name a few of the material disputes, the parties disagree about whether Convera knew that DSMCi did not want Convera to have access to its database schema, when Convera learned that DSMCi did not want Convera to have access, whether Convera used or disclosed DSMCi's trade secrets, and whether Convera knew or should have known that NGTL owed a duty to DSMCi to maintain the secrecy of DSMCi's intellectual property and keep

its trade secrets confidential.  Because there are genuine
disputes of material fact as to the existence of trade secrets
and whether those trade secrets were misappropriated, the Court
denies summary judgment to Convera on the misappropriation of
trade secrets claim.

    C.    **Copyright Infringement**

    The Copyright Act provides that, "no action for infringement
of the copyright in any United States work shall be instituted
until preregistration or registration of the copyright claim has
been made in accordance with [the Copyright Act]").  17 U.S.C.
§ 411(a).  Copyright registration is a jurisdictional
prerequisite to a court hearing a copyright infringement action.
*See I.M.S. Inquiry Mgmt. Sys. v. Berk Info. Sys.*, 307 F. Supp. 2d
521, 526 (S.D.N.Y. 2004) ("The registration requirement is
jurisdictional; a lack of registration bars an infringement
claim.").

    On March 1, 2002, DSMCi filed a Certificate of Registration
in the United States Copyright Office for the MAS Version 1.3
computer program that it used for NGTL.  DSMCi also filed a
portion of the MAS Version 1.3 source code with the Copyright
Office.  DSMCi identifies that registered code as the code in its
"source" subfolder in the "ngt_Gold" folder.  Def.'s Facts ¶ 43.
This electronic folder holds DSMCi's software code for the NGTL

website and includes about 240 HTML files containing server-side JavaScript and client-side HTML and JavaScript.

DSMCi and Convera disagree as to whether DSMCi's schema for the NGTL database is part of the materials registered with the Copyright Office.  DSMCi argues that the schema is "embodied in" the computer program that was registered in 2002.  Pl.'s Opp'n at 31.  Convera counters that any claims for copyright infringement of the database schema must be dismissed for lack of subject matter jurisdiction because the registered material does not include the schema.  The Court rejects Convera's narrow reading of what is protectable when a company registers a computer program and therefore declines to dismiss the copyright claim based on lack of subject matter jurisdiction.

A computer program is "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result."  17 U.S.C. § 101.  Copyright protection "extends to all the copyrightable expression *embodied in* the computer program."  United States Copyright Office, Circular 61, *Copyright Registration for Computer Programs* (2006) (emphasis added).  Copyright protection extends not only to the literal elements of a computer program -- source code and object code[11]

---

[11] "Source code is a symbolic language that humans can read, whereas object code is the translation of the source code into a series of zeros and ones that is readable by a computer."  *MiTek Holdings, Inc. v. Arce Eng'g Co.*, 89 F.3d 1548, 1555 n.15 (11th Cir. 1996).

-- but also to the program's nonliteral elements, which are "the products that are generated by the code's interaction with the computer hardware and operating program(s)." *MiTek Holdings*, 89 F.3d at 1555 n.15; *see also General Universal Sys., Inc. v. Lee*, 379 F.3d 131, 142 (5th Cir. 2004) (finding that copyright protection of a computer program extends to nonliteral elements, including "structure, sequence, organization, user interface, screen displays and menu structures"); *Whelan Assoc., Inc. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1248 (3d Cir. 1986) (holding that copyright protection of computer programs "extend beyond the programs' literal code to their structure, sequence, and organization").  Based on this broad understanding of the nonliteral elements of computer programs, the Court finds that the database schema was "embodied in" the computer program registered with the Copyright Office.

To prevail on a copyright claim, a plaintiff must demonstrate "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *see also Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1295 (D.C. Cir. 2002).  To show ownership of a valid copyright and therefore satisfy the first *Feist* prong, "a plaintiff must prove that the work as a whole is original and that the plaintiff complied with applicable statutory formalities." *Lotus Dev.*

*Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, (2d Cir. 1995).  "In
any judicial proceedings the certificate of a registration made
before or within five years after first publication of the work
shall constitute prima facie evidence of the validity of the
copyright and of the facts stated in the certificate.  The
evidentiary weight to be accorded the certificate of a
registration made thereafter shall be within the discretion of
the court."  17 U.S.C. § 410(c); *see also Bibbero Sys., Inc. v.
Colwell Sys., Inc.*, 893 F.2d 1104, 1106 (9th Cir. 1990) ("In
judicial proceedings, a certificate of copyright registration
constitutes prima facie evidence of copyrightability and shifts
the burden to the defendant to demonstrate why the copyright is
not valid.").  For purposes of its summary judgment motion,
Convera concedes that DSMCi has a valid copyright registration.

To prove the second *Feist* prong, the plaintiff must show
that (1) the defendant copied the plaintiff's work as a factual
matter and (2) that "the copying of copyrighted material was so
extensive that it rendered the offending and copyrighted works
substantially similar."  *Lotus*, 49 F.3d at 813.  A plaintiff may
prove the first element through either direct or circumstantial
evidence.  Circumstantial evidence of copying consists of proof
that "the alleged infringer had access to the copyrighted work
and that the offending and copyrighted works are so similar that

the court may infer that there was factual copying (i.e., probative similarity)."[12]   *Id.*

DSMCi argues that the record is replete with direct evidence of Convera copying DSMCi's database schema, user interface, and code.  DSMCi further argues that Convera had extensive access to its copyrighted material by receiving the backup tape and "icepick" password from NGTL and through alleged wrongful access to the NGTL website.  DSMCi also points to email and other documentary evidence in the record from which the Court can draw an inference at this stage that Convera accessed DMAS with the express purpose of examining DSMCi's database schema and copying it.  Accordingly, DSMCi has at least raised a genuine issue of fact as to whether there was copying as a factual matter.

Substantial similarity "is customarily an extremely close question of fact."  *Sturdza*, 281 F.3d at 1296 (internal quotation marks and citations omitted).  Accordingly, "summary judgment has traditionally been frowned upon" in copyright litigation.  *Atkins v. Fischer*, 331 F.3d 988, 993 (D.C. Cir. 2003) (citing *Sturdza*, 281 F.3d at 1296).  Summary judgment for a defendant accused of copyright infringement is appropriate, however, "when the plaintiff fails to show a genuine issue regarding whether the

---

[12] "This requirement of probative similarity is somewhat akin to, but different than, the requirement of substantial similarity that emerges at the second step in the progression."  *Johnson v. Gordon*, 409 F.3d 12, 18 (1st Cir. 2005).

ideas and expressive elements of the works are substantially similar." *Brownbag Software v. Symantec Corp.*, 960 F.2d 1465, 1472 (9th Cir. 1992).  Plaintiff bears the ultimate burden of proving that the allegedly infringing work is substantially similar to plaintiff's copyrighted work.  *Id.*  "A 'genuine issue' exists when the plaintiff provides indicia of 'a sufficient disagreement' concerning the substantial similarity of two works 'to require submission to a jury.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

In this case, DSMCi points to evidence that suggests a "sufficient disagreement" regarding substantial similarity to survive summary judgment.  Again, through email evidence and Convera's internal documents, DSMCi argues that Convera accessed DMAS with the express purpose of creating something substantially similar.  DSMCi argues that with access to the backup tape, "icepick" password, and user identification "Wart," Convera was able to decipher the inner workings of DMAS.  DSMCi also argues that there is substantial similarity between DMAS and the Screening Room/NGTL Database in database schema, user interface, and screen design code.  Viewing the facts in the light most favorable to the plaintiff, DSMCi has pointed to enough evidence to demonstrate that there is a genuine issue as to whether the expressive elements in DSMCi's DMAS program are substantially similar to Convera's replacement program.

28

In allowing the copyright claim to go forward to trial, the Court also rejects Convera's argument that any alleged intermediate copying of the database schema in order to write scripts to migrate the NGTL data into Convera's Screening Room product was fair use under the copyright laws.  In support of its claim that any alleged intermediate copying was fair use, Convera cites *Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640 (7th Cir. 2003).  In *WIREdata*, the Court held that "[f]rom the standpoint of copyright law, all that matters is that the process of extracting the raw data from the database does not involve copying [the computer program] or creating . . . a derivative work; all that is sought is raw data, data created not by [the plaintiff] but by [a third party], data that are not in the public domain."  350 F.3d at 644.  The Seventh Circuit further stated that even if the raw data were so entangled with the computer program that they could not be extracted without copying the program, such "intermediate copying" could be fair use and therefore not infringe a copyright.  *Id*. at 644-45.  However, the court also noted that copying of raw data is fair use in those situations where the "only purpose of the copying would be to extract noncopyrighted material, and not to go into competition with" the plaintiff from whom there was intermediate copying.  *Id*. at 645; *see also Sega Enterprises, Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1520-28 (9th Cir. 1992) (finding

that copying source code of a game console through reverse engineering by a company who wanted to design computer games compatible with the console was fair use because the alleged infringer was not a competitor trying to create a game console).

In this case, Convera is admittedly a direct competitor of DSMCi.  The email evidence and internal documents from Convera discussed above suggest that Convera not only wanted to extract raw data but also wanted to create a product similar to DMAS that contained many of the same features as DMAS.  Accordingly, Convera is in a very different posture than the parties in *WIREdata* and *Sega* who engaged in "intermediate copying."

### D.   Conspiracy Claims

In its Third Amended Complaint, DSMCi alleges violations of the Virginia Business Conspiracy Act ("VBCA"), Va. Code §§ 18.2-499 and 18.2-500, and DC common law on civil conspiracy.[13]  For both claims, DSMCi alleges that NGTL conspired with Convera "to provide Convera with access to the trade secrets and labor of [DSMCi], so that Convera could and did wrongfully engineer, misappropriate, copy, prepare derivatives from and circumvent DSMC's right in its trade secrets and MAS software, and wrongfully avail itself to [DSMCi's] labors."  Third Am.

---

[13] The Court questions whether DSMCi's claims under Virginia statutory law and DC common law violate choice-of-law principles. However, the Court need not reach this issue because, as discussed below, the DCUTSA and Virginia UTSA are identical and both conspiracy claims are preempted.

Compl. ¶¶ 50, 53.  The conspiracy claims in the Third Amended
Complaint are clearly focused on misappropriation of trade
secrets.

In *MicroStrategy, Inc. v. Business Objects, S.A.*, 429 F.3d
1344, 1363-64 (Fed. Cir. 2005), the Federal Circuit held that the
Virginia Uniform Trade Secrets Act ("VUTSA") preempts claims not
brought under the VUTSA and predicated on a misappropriation of
trade secrets.  The court noted that the VUTSA preempts "*all*
claims for relief, including both common law *and* statutory causes
of action, if they provide for a civil remedy for
misappropriation of trade secrets, *unless* they are contractual or
criminal in nature."  *Id.*; *see also* VUTSA, Va. Code § 59.1-341
(stating that the VUTSA "displaces conflicting tort,
restitutionary, and other law of this Commonwealth providing
civil remedies for misappropriation of a trade secret.").  The
language in the VUTSA is identical to the language in the DCUTSA.
*Compare* Va. Code § 59.1-341 *with* D.C. Code § 36-407.  Moreover,
the DCUTSA was intended to "make uniform the law with respect to
trade secrets among the District of Columbia and those states
enacting it."  D.C. Code § 36-408.

Although DSMCi's conspiracy claims in its Third Amended
Complaint are clearly predicated on misappropriation of trade
secrets, DSMCi tries to broaden the conspiracy claims in its
opposition to Convera's motion for summary judgment.  DSMCi

argues in its opposition brief that Convera and NGTL conspired to replace DSMCi as NGTL's vendor, issued a press release in which Convera took credit for intellectual property developed by DSMCi, and acted in concert to willfully injure DSMCi's business.  DSMCi also argues that Convera and NGTL conspired to violate and did violate a federal criminal computer fraud statute (18 U.S.C. § 1030).  The Court rejects DSMCi's attempts to amend its complaint through its opposition to Convera's motion for summary judgment.  *See Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.").  Because the Court reads the conspiracy claims in the Third Amended Complaint to allege conspiracy to misappropriate trade secrets, both the common law and statutory conspiracy claims are preempted.  Accordingly, the Court grants Convera summary judgment on the conspiracy claims.

### E.   Digital Millennium Copyright Act

DSMCi originally alleged a violation of the Digital Millennium Copyright Act ("DMCA") in its Third Amended Complaint. However, in its opposition brief and at oral argument DSMCi indicated that this claim has been dismissed with the consent of counsel.  The Court therefore need not reach the merits of this claim.

**F.      Setoff**

The Third Amended Complaint alleged claims against both NGTL and Convera.  NGTL, however, settled with DSMCi.  If any damages are awarded to DSMCi after trial, Convera is entitled to a *pro tanto* setoff of the amount of DSMCi's settlement with NGTL.

**III. CONCLUSION**

For the foregoing reasons, the Court **grants in part and denies in part** Convera's Motion for Summary Judgment.  The motion is granted as to the DMCA claim (Count III), civil conspiracy claim (Count VII), and VBCA claim (Count VIII).  The motion is denied as to the misappropriation of trade secrets claim (Count I) and copyright infringement claim (Count II).  An appropriate Order accompanies this Memorandum Opinion.

**Signed:**      **Emmet G. Sullivan**
              **United States District Judge**
              **March 27, 2007**